1999 SD 87

**COYOTE FLATS, L.L.C., Plaintiff and Appellee,**

v.

**SANBORN COUNTY COMMISSION,**
Sanborn County, South Dakota,
Defendant and Appellant.

No. 20665.

Supreme Court of South Dakota.

Argued April 27, 1999.

Decided July 14, 1999.

Mark V. Meierhenry of Danforth, Meierhenry & Meierhenry, Sioux Falls, for plaintiff and appellee.

Jeffrey D. Larson, Sanborn County State's Attorney, Woonsocket, and James G. Abourezk, Special Deputy State's Attorney, Sioux Falls, for defendant and appellant.

GILBERTSON, Justice.

[¶ 1.] County Commission appeals the final order of the Fourth Judicial Circuit, Sanborn County. The trial court reversed and remanded the Commission's decision and ordered the Commission to meet as a planning commission and to approve a special use permit for Coyote Flats, L.L.C.

(Coyote Flats), to operate a commercial hog feedlot. The Commission appeals. We reverse.

## FACTS AND PROCEDURE

[¶ 2.] In the spring of 1997, the Sanborn County Board of Commissioners [1] received an application from Coyote Flats for a special use permit to construct a hog confinement unit that would contain approximately 6,000 hogs. At the same time the Commissioners attempted to enact new county ordinances to amend the existing county zoning ordinance. The amendments dealt with requirements for animal confinement units.

[¶ 3.] Based on the new ordinances, the Commission denied the permit application of Coyote Flats. Coyote Flats appealed to the circuit court, which struck down the new ordinances as not properly enacted. It then remanded the permit issue to the Commission to consider the application under the existing county ordinance that had been in effect since the early 1970's.

[¶ 4.] On remand, a hearing before the Commission was held on April 7, 1998. Coyote Flats was again denied the special use permit. The Commission found the proposed facility would create significant odor, increase traffic and additional trucks would damage roads and cause the inevitable loss in value of the neighboring land. It concluded the facility would be detrimental to the health, safety and general welfare of the people residing in the area near the proposed site and would be a nuisance. Coyote Flats again appealed to the circuit court.

[¶ 5.] The circuit court found the Commission's decision to be arbitrary and capricious. The court remanded the case back to the Commission. It further ordered the Commission to meet as a planning commission and approve the special use permit.

1. For the sake of simplicity the Planning Commission, Board of Adjustment and Board of Commissioners will be referred to as Commission or Commissioners. In Sanborn County, all three entities are composed of the same persons. These entities switch from one body to another by calling a meeting of that particular body.

[¶ 6.] The Commission appeals raising several issues, one of which is dispositive:

> **Whether the trial court erred in its ruling the Commission's denial of a special use permit was "arbitrary and capricious."** [2]

## STANDARD OF REVIEW

■ [¶ 7.] SDCL 7–8–30 provides an appeal from a decision of a county commission shall be heard and determined by the circuit court de novo. In *Schrank v. Pennington County Bd. of Comm'rs*, 1998 SD 108, ¶ 15, 584 N.W.2d 680, 682, we concluded "this standard means 'the circuit court should determine anew the question ... independent of the county commissioner's decision.'" [3] As such:

> When we review such actions of a board of county commissioners after an appeal to the circuit court, we apply the clearly erroneous standard to factual findings, but accord no deference to the legal conclusions of the circuit court.

*Gregoire v. Iverson*, 1996 SD 77, ¶ 14, 551 N.W.2d 568, 570 (citing *Tri County Landfill Ass'n v. Brule County*, 535 N.W.2d 760, 763 (S.D.1995)).

**2.** Sanborn County also raises the issue of whether the trial court erred when it ordered the Commission to meet as a planning commission and as a board of county commissioners and approve Coyote Flats' special use permit. Sanborn County claims the trial court effectively stripped the Commissioners of their statutory legislature power by ordering them to approve the permit. If the Commissioners were acting in a legislative capacity in denying Coyote Flats permit, this would be a valid argument. However, in denying Coyote Flats permit, the Commission was acting in a quasi-judicial capacity. As they were acting in this capacity, the trial court would have the authority to remand and order the Commission to proceed in a certain manner. "The circuit court ... may send the [cause] back to the board of county commissioners with an order how to proceed...." SDCL 7–8–31. *See also Spallone v. U.S.*, 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990).

**3.** In *Weger v. Pennington County*, 534 N.W.2d 854, 858 (S.D.1995), we had cause to examine

## ANALYSIS AND DECISION

■ [¶ 8.] Before we proceed on the merits of this case we must review a procedural issue that has been raised by Coyote Flats. That procedural issue is the burden of proof before the circuit court. Coyote Flats argues on an appeal to the circuit court, the Commission has the burden of proof. This is incorrect. It is well established on an appeal from the zoning commission, the party appealing has the burden of proof before the circuit court. *See Chokecherry Hills Estates, Inc. v. Deuel County*, 294 N.W.2d 654, 656 (S.D. 1980) (appellant must meet the burden in a challenge to the application of a zoning ordinance); *see also City of Madison v. Clarke*, 288 N.W.2d 312, 314 (S.D.1980) (person appealing from the board of adjustment has to meet the burden of proof); *cf. Fortier v. City of Spearfish*, 433 N.W.2d 228, 230–31 (S.D.1988) (party attacking zoning ordinance carries the burden of overcoming the ordinance's presumption of validity); *City of Colton v. Corbly*, 323 N.W.2d 138, 139 (S.D.1982) ("One assailing the validity of a zoning ordinance has the burden of overcoming this presumption of validity and must show that the ordinance is unreasonable and arbitrary."). That assailing party was

the authority of a circuit court over a board of county commissioners. In determining there existed no right to a direct taxpayer suit rather than an appeal from the decision of the commissioners, we concluded:

> These appeal statutes clearly attempt to strike a proper balance between the necessity of county government to operate in an efficient and orderly fashion and the right of its citizens to pursue injustices in the courts of this state through an appeal process. We agree with the observation of the trial court in this case that the appeal statutes protect the public and individual citizens from the "unfettered whims" of a county commission. However, "the overall effect of [Weger's] actions, if it were permitted to exist, would be to place a Circuit Court Judge in the position of being a one person county commission. That was never meant to be."

*Id.*

Coyote Flats, and therefore it had the burden of proof.

[¶ 9.] As to the issue on the merits, under SDCL ch 11–2, the South Dakota Legislature has created an entity called a county planning commission. SDCL 11–2–2. The planning commission has been authorized to prepare a comprehensive plan[4] for the County. SDCL 11–2–11. Zoning ordinances[5] and other controls deemed necessary are included as adjunct to and in accordance with the comprehensive plan. *Id.* Sanborn County adopted its comprehensive plan in the 1970's. The ordinances passed in accordance with the comprehensive plan and their application are at issue in this case.

[¶ 10.] Under the Sanborn County Zoning and Subdivision Regulations each land use must be in conformity with the regulations specified for the district in which it is located. For example, if the district is zoned residential, any operation must be in conformity with the requirements of a residential district. Agricultural land is exempt from mandatory conformity with district requirements, with the exception of commercial feedlots.[6]

[¶ 11.] The area where Coyote Flats proposed to locate its feedlot is zoned an

---

4. SDCL 11–2–1(3) defines comprehensive plan as:

> "Comprehensive plan," a document which describes in words, and may illustrate by maps, plats, charts, and other descriptive matter, the policy, goals and objectives of the board to interrelate all functional and natural systems and activities relating to the development of the territory under its jurisdiction[.]

5. Once again, the applicable ordinance at issue was not made part of the record. The circuit court erroneously took judicial notice of the ordinance without attention to this Court's well-established rule:

> Absent statutory authorization, courts of general jurisdiction, such as our circuit courts, may not take judicial notice of municipal ordinances. An ordinance therefore must be introduced into evidence and be made part of the record.

> *Nase v. Christensen,* 409 N.W.2d 131, 132 (S.D.1987) (footnote and internal citation omitted). *See also Anderson v. Adamson,* 79 S.D. 429, 112 N.W.2d 612 (1962); *McDonnel v. Lakings,* 78 S.D. 195, 99 N.W.2d 799 (1959).

> The rationale for the rule that we do not take judicial notice of a municipal ordinance was stated in *McDonnel,* 78 S.D. 195, 99 N.W.2d 799. In *McDonnel,* we would not consider a city ordinance of Sioux Falls printed in the appellant's brief. The ordinance had not been offered or received in evidence at the trial level so we refused to take judicial notice of it. Quoting a case from our neighboring state of Nebraska we said:

> > This court cannot undertake to notice the ordinances of all the municipalities within its jurisdiction, nor to search the records for evidence of their passage, amendment, or repeal. A party relying upon such matters must * * * in some manner present them as part of the record.

> *McDonnel,* 78 S.D. at 201–02, 99 N.W.2d at 802 (citing *Steiner v. State,* 78 Neb. 147, 110 N.W. 723, 724 (1907)). In *McDonnel,* we reached a decision on the merits of the case, but without considering the ordinance in the appellant's brief.

> We do not have a complete copy of the county ordinance from which to make our decision. Whether we take judicial notice of a municipal ordinance is a procedural issue. *See Albers v. Kuper,* 518 N.W.2d 745, 746–48 (S.D.1994) (Wuest, J., concurring specially) (citing *Anderson,* 79 S.D. at 436–42, 112 N.W.2d at 615–18) (Hanson, J., dissenting). Therefore, if it is not objected to on the record, it can be waived upon appeal just as any other procedural issue. *State v. Hauge,* 1996 SD 48, ¶ 13, 547 N.W.2d 173, 177 (citing *State v. Sprik,* 520 N.W.2d 595, 601 (S.D. 1994); *State v. Wall,* 481 N.W.2d 259, 265 (S.D.1992)) (a failure to specifically object is a waiver of the right to raise the issue on appeal). *See also Welsh v. Centerville Township,* 1999 SD 73, ¶ 9, n.1, 595 N.W.2d 622, 625, n.1. Therefore, in reaching the merits of this case we will use the portions of the ordinance provided in the County's brief and the record.

6. Section 3(1) of the Sanborn County Zoning and Subdivision Regulations reads:

> No building, structure, or land shall hereafter be used or occupied, and no building or structure or part thereof shall hereafter be erected, constructed, reconstructed, moved, or structurally altered except in conformity with all of the regulations herein specified for the district in which it is located; provided, however, that the use of land for farming or agricultural purposes, except

agricultural district under Section 5 of the Zoning Ordinance.[7] Under this same subsection even if a proposed commercial feedlot would be located in an agricultural zoned district, the applicant must obtain a special use permit from the county.[8]

[¶ 12.] *a. Arbitrary and Capricious*

[¶ 13.] The trial court concluded the Commission's denial of Coyote Flats' special use permit to be arbitrary and capricious. *See Stafford v. Pullen,* 125 Ind. App. 143, 123 N.E.2d 191, 193 (1954) (allegations of arbitrary or capricious acts are conclusions of law); *Cf. Kellogg v. Hoven School Dist. No. 53–2,* 479 N.W.2d 147, 149–51 (S.D.1991) (trial court did not err in its conclusion of law that the school board acted arbitrarily and capriciously). This decision was based on an analysis of the provided sections of the comprehensive plan. Under Section 5.14(11), a special use exception must be obtained to build and operate a commercial feedlot. From the ordinance provided in the brief, a "commercial feedlot" is defined as:

A confinement of food or fur-bearing animals, for commercial purposes, in building lots, pens, pools, or ponds which normally are not used for raising crops or grazing animals.

The trial court found the definition to be extremely broad and vague. When attempting to ascertain the scope of the definition, the trial court construed it to possibly include every farming operation in Sanborn County. Considering the claim that no other farming operation in Sanborn County was in compliance with the ordinance and the broad definition of commercial feedlot, the trial court concluded the Commission's denial was arbitrary and

capricious and an abuse of discretion. We find the trial court erred for the reasons detailed below.

[¶ 14.] Our case law provides that an arbitrary and capricious action is:

based on personal, selfish, or fraudulent motives, or on false information, and is characterized by a lack of relevant and competent evidence to support the action taken.

*Tri County Landfill,* 535 N.W.2d at 764 (citing *Hendriks v. Anderson,* 522 N.W.2d 499 (S.D.1994); *Iversen v. Wall Bd. of Educ.,* 522 N.W.2d 188 (S.D.1994); *Riter v. Woonsocket School Dist., # 55–4,* 504 N.W.2d 572 (S.D.1993)).

[¶ 15.] The Commission based its denial of Coyote Flats' conditional use permit on the following findings:

1. The proposed facility was within Elliott Township, a heavily populated area.

2. There will be an increase in large truck traffic at the site and roads will be severely damaged from such traffic.

3. Adjacent properties will be devalued because of the location of this facility.

4. This facility would create air pollution through noxious odors.

5. The potential of water pollution.

[¶ 16.] Despite the fact Coyote Flats carried the burden of proof, there is a near total absence of evidence in the record that would allow the circuit court to label the Commission's findings as arbitrary and capricious. There is no evidence the Commission's action is "based on personal, self-

commercial feed lots, is specifically exempt from the provisions of this ordinance.

**7.** Under Section 5.11 of the zoning ordinance, the intent of an agricultural district is: "to provide for general agricultural use and for the protection of agricultural resources from detrimental effects of urban development."

**8.** Section 5.14 provides a special use permit can be issued for:

[c]ommercial feedlots as defined by this Ordinance, provided, however, that no such special exception shall be issued unless and until the proprietor of such a feedlot has complied with the provisions of [SDCL ch 34A–2] and provided further that *no such special exception shall be issued if said feedlot would constitute a nuisance in the opinion of the Zoning Commission.*
(Emphasis added).

ish, or fraudulent motives, or on false information...." *Tri County Landfill,* 535 N.W.2d at 764. There is no "lack of relevant evidence" in the record brought forth by the Commissioners. *Id.* Therefore, the Commission's action *cannot* be labeled arbitrary and capricious. To establish why we find the trial court's legal conclusion of "arbitrary and capricious" to be erroneous, we will discuss the evidence supporting each finding below.

### [¶ 17.] *i. Population*

[¶ 18.] There is ample evidence in the record that supports the Commission's decision that this facility would constitute a nuisance due to its proximity to the neighboring population. First, there is testimony by Charlotte Brewer (Brewer), a resident of the area who lives within a mile from the proposed feedlot. Robert Sonne (Sonne) also testified he lives 0.6 of a mile from the proposed facility. Commissioner Moe testified he considered the establishment of the facility in this particular area to be a nuisance due to the location of Coyote Flats' nearest neighbors. This evidence went unchallenged by Coyote Flats.

### [¶ 19.] *ii. Roads*

[¶ 20.] A fundamental factor for the Commission's denial was the effect on the roads. Commissioner Thompson testified that the County would receive only $600.00 in additional tax revenue from this venture. It was not enough to cover the damage the roads would sustain due to the new facility. Commissioner Moe testified the damage to the roads was one of the factors he considered in denying the permit. He stated:

by the time you build [the confined feeding operation], haul them in and haul the

hogs in, haul the feed in and haul them out again, and then you've got the manure to get rid of, that would be on the county roads and township roads.

All of the Commissioners expressed a concern over the repairs that would have to be made to the roads.[9] There was no rebuttal evidence to the contrary offered by Coyote Flats.

### [¶ 21.] *iii. Devaluation of surrounding real estate*

[¶ 22.] It is well established in South Dakota that a landowner may testify as to the value of his or her land subject only to the same requirements as an expert giving an opinion on valuation. *City of Sioux Falls v. Johnson,* 1999 SD 16, ¶ 13, 588 N.W.2d 904, 908 ("The landowner is presumed to have 'special knowledge of the property, its income producing capacity, and other pertinent traits sufficient to render an opinion as to value.'"). Brewer, who had raised hogs herself, testified that the value of her property would be significantly diminished due to the nuisance conditions created by the feedlot. Sonne, who lives 0.6 of a mile from the proposed facility, testified his land would also be devalued. Commissioner Moe testified that he voted against the special use permit because it was going to affect land values.[10] Coyote Flats did not challenge his knowledge of local land values and in fact offered no counter evidence on this subject.

### [¶ 23.] *iv. Noxious odors*

[¶ 24.] There is no other finding more supported in the record than the fact this facility will give out a very powerful and offensive odor. Darren Swenson, of Coy-

---

9. Since the County Commissioners are statutorily charged with the responsibility for oversight of the county highway system (SDCL 31–12–19), they are clearly knowledgeable to testify as to its present condition and the effects of heavier traffic upon its future maintenance. They are also charged with setting the budget for the upkeep and improvement

of the county highway system. SDCL 31–12–32.

10. The County Commissioners also sit as a County Board of Equalization (SDCL 10–11–25) which annually reviews the fair market value of real property in the county for taxation purposes (SDCL 10–11–26).

ote Flats, even admitted before the Commissioners the facility would smell.

[¶ 25.] Brewer, who had raised hogs with her late husband in the 45 years she had lived in this particular area, testified with that amount of hogs, the smell would be overwhelming. She stated "if the wind was in the south and a warm, muggy day like today, you wouldn't want to eat...." County Commissioner Denton Thompson testified the smell from a neighbor's small hog facility required Thompson to close the windows of his house when the wind was from the neighbor's direction. Sonne, who also raised hogs, testified as to the extent of the smell. He stated even with small neighboring hog farms, "you can't hold your breath long enough to get by [them]." Commissioner Senska testified the smell of the facility was one of the reasons he voted to deny the special use permit. Commissioner Moe testified his decision to deny the permit was in part based on the smell the facility would create.

### [¶ 26.] v. Pollution

[¶ 27.] At the trial before the circuit court, Commissioner Senska testified the potential for pollution was a factor he considered when denying the permit. Sonne also expressed concern about pollution ending up on his land.[11] There was testimony by Coyote Flats that if the area were to receive two 25–year rains within a short period of time, its waste lagoon would overflow, draining onto neighboring lands and into waterways.

[¶ 28.] In conclusion, the Commission found the facility would create a public and private nuisance and would be detrimental to the health, safety and general welfare of the area's residents. Certainly, the information above cannot be considered a lack of evidence. The record shows no hint of personal, selfish or fraudulent motives on the part of the Commission. All of the factors backing this decision, land value, pollution, population, roads and noxious odors are relevant and reasonable. There is no evidentiary basis to conclude the uncontradicted evidence submitted by the Commissioners was false or inaccurate.

[¶ 29.] Coyote Flats has two principal arguments in support of the trial court's decision. First, Coyote Flats points to the case of *Breckweg v. Knochenmus,* 81 S.D. 244, 133 N.W.2d 860 (1965) as lending support to its case. There, Breckweg and others sought a writ of mandamus to compel the supervisors of Mapleton Township to issue them a building permit to build a gas station. Under SDC 1960 Supp 58.0201(9),[12] townships had been granted the power by the legislature to prescribe the manner of constructing buildings and to require building permits before any construction. *Id.* at 254, 133 N.W.2d at 864. The township had provided a building permit process yet there were no codes, regulations, zoning ordinances or restrictions.

[¶ 30.] Breckweg had applied for a building permit for a gas station. The permit had been denied because the Board of Supervisors thought it was not a suitable area for the construction of a gas station.

[¶ 31.] At the appeal before the trial court, the supervisors testified the gas station would be detrimental to the health, safety and general welfare of the area people. Breckweg alleged the Board acted arbitrarily and capriciously and claimed the ordinance was unconstitutional due to its lack of standards and guidelines.

[¶ 32.] Noting the township had not provided any prohibitory building regulations or zoning ordinances, we affirmed the trial court's determination that the Township acted in an arbitrary and capricious manner by denying Breckweg a building permit. *Id.* We also noted an anticipated

---

11. This is not Sonne's speculation. Sonne testified he has already experienced the pollution effects of a manure overflow from a neighbor's small hog operation onto his fields.

12. This statute is now SDCL 8–2–9.

nuisance could not be forbidden unless it was shown:

> (1) that the proposed construction or use to be made of the property is a nuisance per se;[13] or (2) that while it may not amount to a nuisance per se, under the circumstances of the case, a nuisance must necessarily result from the contemplated act.[14]

*Id.* at 865 (citation omitted) (footnotes added).

[¶ 33.] The *Breckweg* case is distinguishable from the case at hand for two reasons. First, *Breckweg* concerns the powers of a township. As we recently said in *Welsh*, township powers are statutorily limited in relation to county zoning authority. 1999 SD 73 at ¶ 15, 595 N.W.2d at 627. The legislature intended for a county comprehensive zoning plan, not the township, to provide for the protection and guidance of "physical, social, economic and, environmental development of the county." *Id.* Under SDCL 11-2-36, the legislature has granted the board of county commissioners the power to:

> [A]dopt zoning ordinances, resolutions or regulations designating or limiting the location, height, bulk, number of stories, size of, and the specific uses for which dwellings, buildings and structures . . .; [provide] sanitary, safety and protective measures that shall be required. . . .

*Welsh*, 1999 SD 73 at ¶ 15, 595 N.W.2d at 627. We are not dealing with a township ordinance in this case, but county zoning authority. The legislature clearly sanctioned the counties with this police power. Police powers, in the shape of county zoning authority clearly extend to the prevention and abatement of nuisances. *See* SDCL 7-8-33; *see also Wartensleben v. Willey*, 415 P.2d 613, 616 (Wyo.1966). The law surrounding *Breckweg* and the case now before us deal with two entirely different statutes. *Breckweg* concerns the township zoning authority covered now by SDCL ch 8-2. We are concerned with county zoning authority covered by SDCL ch 11-2.

[¶ 34.] Even if *Breckweg* were legally applicable, it would be more supportive to the County's position than to Coyote Flats. There is sufficient evidence in the record to show the operation of Coyote Flats would constitute the exception to the rule that you cannot enjoin an anticipated nuisance. A feedlot comprised of 6,000 swine at this location would be considered a *nuisance in fact.* The County has provided sufficient evidence in the record, largely if not completely, unrebutted by Coyote Flats, to show that a nuisance would necessarily result from this contem-

---

**13.** South Dakota's earliest discussion of nuisance per se can be found in *Colton v. South Dakota Cent. Land Co.*, 25 S.D. 309, 313, 126 N.W. 507, 508–09 (1910). In that case we explained:

> The phrase "nuisance per se" is misleading. It often has been inappropriately employed. Strictly speaking, no act or omission is a nuisance regardless of surrounding conditions. No one can create a nuisance in the absence of some one affected by the former's act or omission. A slaughterhouse that would annoy no one if situated in an uninhabited gulch might be an intolerable menace to health when located in the residence sections of a city or town. The circumstances may be such as to render the most exquisite music both annoying and injurious. "Since there must be some place where every lawful business or erection may be lawfully located or carried on, the

> better rule would seem to be that a lawful business or erection is never a nuisance per se, but may become a nuisance by reason of extraneous circumstances, such as being located in an inappropriate place, or being conducted in an improper manner. It may be said, however, that some lawful businesses and erections are prima facie nuisances in certain localities."

> *Id.* (internal quotations omitted).

**14.** Factor 2 is better known by its legal terms, nuisance in fact or a nuisance per accidens. A nuisance in fact or a nuisance per accidens is defined as: "Acts, occupations or structures which are not nuisances per se but may become nuisances by reason of the circumstances of the location and surroundings[.]" Black's Law Dictionary 1066 (6th Ed. 1990).

plated facility. *Breckweg*, 81 S.D. at 253, 133 N.W.2d at 865.

[¶ 35.] Operating a swine feedlot is in itself entirely legitimate. The ability to carry on the business of your choice on your real estate invokes substantial property rights that should not be thoughtlessly disregarded. However, everyone must use their own rights as not to infringe upon the rights of others. *Colton*, 25 S.D. at 313–14, 126 N.W. at 509. The feedlot in question would create large amounts of manure and offal. It would cause noxious and annoying smells. As is conceded by Coyote Flats, the offensive smell of 6,000 swine is too apparent for argument.

[¶ 36.] The general proposition a county may not abate a nuisance in advance is further overcome by SDCL 7–8–33. The statute provides:

> The board of county commissioners of every county may, by ordinance, allow for the declaration and abatement of a public nuisance within the county outside the corporate limits of any municipality. For purposes of this section only, the feeding, breeding or raising of livestock or the operations of a livestock sales barn, is not presumed, by that fact alone, to be a nuisance.

[¶ 37.] It is not the feedlot itself that is the nuisance. It is the feedlot combined with other factors relied upon by the County Commission as a basis for its decision that makes this feedlot a nuisance in fact in this specific location. The circumstances and surroundings are the key to this facility being declared a nuisance. *See Colton*, 25 S.D. at 313–14, 126 N.W. at 509

("[A business] may become a nuisance by reason of extraneous circumstances, such as being located in an inappropriate place, or being conducted in an improper manner."). Considering the evidence presented, especially the size of the feedlot and its location, the trial court was clearly erroneous in its factual determinations and in error in concluding the Commission acted arbitrarily and capriciously.

[¶ 38.] Finally, Coyote Flats argues it is the only animal feedlot in compliance with the zoning ordinance because it is the only feedlot in the County to have met the two requirements for a permit. Under the Sanborn County zoning ordinance, a commercial feedlot must meet two requirements for a permit. First, the commercial feedlot must comply with the State Department of Environment and Natural Resources (DENR) Requirements. *See* Sanborn County Ordinance, 5.14(11).[15] Second, all "commercial feedlots" must apply for and receive from the Commission, a special use permit.

[¶ 39.] As to the issue of State DENR permits, we will assume from testimony in the record that Coyote Flats has the requisite DENR permits.[16] However, there is no evidence in the record any other feedlot in the county is in violation of the DENR requirements. The evidence presented shows other feedlots in Sanborn County ranging in size from 45 to 500 to approximately 1,000 animal units. These feeding operations consist of swine or cattle. The DENR does not consider feedlots of this size to be concentrated animal feeding operations as to require permits.[17]

---

15. *Supra* note 8.

16. There is testimony that the State permits have been granted. However, a copy of the permit was not provided in the record.

17. Under the DENR regulations, a "concentrated animal feeding operation" would be required to have a South Dakota Surface Water Discharge Permit (SWD permit). ARSD 74:03:17:03(1). For an animal feeding operation to be considered a "concentrated animal feeding operation" as to require a SWD per-

mit, the DENR considers a number of factors which include the size of the operation and the location in relation to waters of the state. ARSD 74:03:18:23. The requisite number of animals that mandates a permit are as follows:

> An animal feeding operation is a concentrated animal feeding operation for purposes of this chapter if either of the following criteria are met:

[¶ 40.] Coyote Flats argues it should not be forced to obtain a special use permit, because no other county livestock producer has ever applied for or received a special use permit. However, there is no evidence in the record that would show these operations are similar to the proposed Coyote Flats feedlot. In particular, the testimony shows no other feedlot has quite the numbers or the density of animals Coyote Flats is proposing.[18]

[¶ 41.] In summary, Coyote Flats has simply not carried its burden to overcome the presumption the Commission acted within its discretion. There is no evidence in the record to support the trial court's conclusion the Commission acted arbitrarily or its decision was the result of mere caprice, based on personal, selfish or fraudulent motives or on false information or characterized by a lack of relevant and competent evidence to support the action taken. Based on the facts of this case, this is clearly a decision by elected officials that is not arbitrary or capricious. Therefore, the trial court erred in its conclusion that the Commissioner acted arbitrarily and capriciously.

[¶ 42.] In upholding the decision of the Commission, we do not create a novel concept now adopted by this Court for the first time. In one of our earlier cases addressing the issue of nuisance we stated, "[a] slaughterhouse that would annoy no one if situated in an uninhabited gulch might be an intolerable menace to health when located in the residence sections of a city or town." *Colton*, 25 S.D. at 313, 126 N.W. at 508. The Commission is not waging war on the idea of hog feeding facilities within its borders such as proposed by Coyote Flats. Its decision was based on the geographical location of the proposal and not the concept itself.[19] This Court is

(1) More than the numbers of animals specified in any of the following categories are confined:
   (a) 1,000 slaughter or feeder cattle;
   (b) 700 mature dairy cattle, whether milked or dry cows;
   (c) *2,500 swine each weighing over 25 kilograms, (approximately 55 pounds);*
   (d) 500 horses;
   (e) 10,000 sheep or lambs;
   (f) 55,000 turkeys;
   (g) 100,000 laying hens or broilers, if the facility has continuous overflow watering;
   (h) 30,000 laying hens or broilers, if the facility has a liquid manure handling system;
   (i) 5,000 ducks; or
   (j) 1,000 animal units; or
(2) More than the following number and *types of animals, as set out in subsections* (a) to (j), inclusive, are confined and either of the conditions of discharge set out under *subsection (h)* are present:
   (a) 300 slaughter or feeder cattle;
   (b) 200 mature dairy cattle, whether milked or dry cows;
   (c) 750 swine, each weighing over 25 kilograms (approximately 55 pounds);
   (d) 150 horses;
   (e) 3,000 sheep or lambs;
   (f) 16,500 turkeys;
   (g) 30,000 laying hens or broilers, if the facility has continuous overflow watering;
   (h) 9,000 laying hens or broilers, if the facility has a liquid manure handling system;
   (i) 1,500 ducks; or
   (j) 300 animal units; and
   (k) Conditions of discharge:
   (i) Pollutants are discharged into surface waters of the state through a man-made ditch, flushing system, or other similar man-made device; or
   (ii) Pollutants are discharged directly into surface waters of the state which originate outside of and pass over, across or through the facility or otherwise come into direct contact with the animals confined in the operation.
ARSD 74:03:18:27. (Emphasis added).
There is simply not enough information in this record to make the determination any other operator in Sanborn County is in violation of DENR permit requirements and thus the Sanborn County Zoning Ordinance.

18. There is nothing in the record to show any other feedlot has more than 1,000 animals or that any other feedlot would be considered a "commercial feedlot" under the ordinance.

19. Commissioner Senska testified:

I assume there's places in Sanborn County that you can probably build a six thousand head swine confinement. But when you start affecting the neighborhood, that's when commissioners have to make the decisions we have to.

not warranted in directing the manner in which the Commission should exercise its legal discretion. *Breckweg*, 81 S.D. at 251, 133 N.W.2d at 864 (citation omitted).

[¶ 43.] We reverse the trial court.

[¶ 44.] MILLER, Chief Justice, and KONENKAMP, Justice, concur.

[¶ 45.] SABERS and AMUNDSON, Justices, dissent.

SABERS, Justice (dissenting).

[¶ 46.] I dissent.

[¶ 47.] Under the Sanborn County Zoning and Subdivision Regulations, a special use permit is required for commercial feedlots. However, the County's definition of commercial feedlot is quite broad and somewhat vague. It defines a commercial feedlot as:

[A] confinement of food or fur-bearing animals, for commercial purposes, in building lots, pens, pools, or ponds which normally are not used for raising crops or grazing animals.

[¶ 48.] Unlike other ordinances defining commercial feedlots, this ordinance does not state how many animals must be involved before an operation is considered a commercial feedlot. Therefore, the definition can reasonably be construed to apply to almost every farming operation involving the raising of animals for commercial purposes located in Sanborn County. However, the trial court heard testimony from several County Commissioners that Coyote Flats was the only operation required to obtain a special use permit.[20]

[¶ 49.] The trial court found that "the testimony at the hearing was clear in showing that no other farming operation within the county possessed a required special use permit. This included not only family owned farms, but several larger operations." In addition, there was no intention to require other existing operations to obtain a permit, unless "there was a problem" with one of them.

Action is arbitrary and capricious if it is based on personal, selfish, or fraudulent motives, or on false information, and is characterized by a lack of relevant and competent evidence to support the action taken.

*Tri County Landfill Ass'n, Inc. v. Brule County*, 535 N.W.2d 760, 764 (S.D.1995) (citing *Hendriks v. Anderson*, 522 N.W.2d 499 (S.D.1994); *Iversen v. Wall Bd. of Educ.*, 522 N.W.2d 188 (S.D.1994); *Riter v. Woonsocket Sch. Dist., # 55–4*, 504 N.W.2d 572 (S.D.1993)). The Sanborn County Zoning and Subdivision Regulations provides:

The regulations set by this ordinance within each district shall be minimum regulations and *shall apply uniformly to each class or kind of structure or land*, and particularly, except as hereinafter provided[.]

(Emphasis added). Here, the ordinance has not been uniformly applied. The trial court concluded that the Commission's denial of the special use permit was arbitrary and capricious because of the broad definition of commercial feedlot and the fact that no other operation has been required to obtain a special use permit. I agree and we should affirm the trial court.

[¶ 50.] Therefore, I dissent.

[¶ 51.] AMUNDSON, Justice, joins this dissent.

---

**20.** This ordinance has been in place since the 1970's.