2005 SD 114

Judith A. ATKINSON, Plaintiff
and Appellant,

v.

CITY OF PIERRE, a municipality, S.
Ellwein, Inc., d/b/a Tour Ice, Inc., Ste-
phen C. Ellwein, d/b/a Tour Ice, De-
fendants and Appellees.

No. 23387.

Supreme Court of South Dakota.

Considered on Briefs on March 21, 2005.

Decided Nov. 16, 2005.

Judith A. Atkinson, Pierre, South Dakota, Pro se appellant.

John L. Brown, Margo D. Northrup of Riter, Mayer, Wattier & Brown, Pierre, South Dakota, Attorneys for appellee City of Pierre.

Brett Koenecke of May, Adam, Gerdes & Thompson, Pierre, South Dakota, Attorneys for appellee S. Ellwein, Inc. d/b/a Tour Ice, Inc., Stephen C. Ellwein, d/b/a Tour Ice.

KONENKAMP, Justice.

[¶ 1.] In this mandamus action on alleged nuisance and zoning ordinance violations, we affirm the circuit court's judgment denying relief.

## Background

[¶ 2.] Defendant Tour Ice began its retail business in 1973. Consisting of a mobile home and garage, it was first located at 420 South Henry Street, Pierre, South Dakota, one block west of its current site at 425 South Central Avenue. The business moved to the latter address in 1991, when its new ice plant was completed. Since its inception, it has operated for thirty-two years in a zone classified as the central business district. Now, at the rate of 100,000 pounds a day, it produces, packages, and sells cube and block ice to retail establishments. Refrigerated trucks deliver its ice products within a 140–mile radius. In 1992, Stephen Ellwein, Inc., purchased the business.

[¶ 3.] Plaintiff Judith A. Atkinson lives on the second floor of a twelve-unit apartment building at 420 South Central Avenue, in the same business district. She has resided there since December 1996. Her apartment has three windows facing the Tour Ice facilities across the street. She prefers to keep all her windows open throughout the year, including the winter months. When the weather is cold, the temperature in her apartment is still hotter than she prefers, and opening her windows is her only solution. Besides enjoying the fresh air for its own sake, she does not feel that she should have to close her windows merely to reduce the noise coming from Tour Ice.

[¶ 4.] Atkinson finds the noise intolerable, nonetheless. According to her, "the general sound level of the compressor and fans running are equal to a vacuum cleaner or a freight train running through [her] bedroom." Tour Ice begins its business day early in the morning when its delivery trucks start up, load ice, and depart for the day's destinations. This surge of noise wakes Atkinson up, but she also objects to the constant, twenty-four-hour a day noise coming from the compressors, cooling fans, cooling towers, and ice augers. Some of the noises are disturbing because they are irregular, like the compressor that kicks on and off every ten to twelve minutes. Although Tour Ice attempted to remedy, or at least muffle, its various machine noises, Atkinson insists that the noise has only increased over time because of expansion. Using a sound meter she purchased over the Internet, Atkinson measured the noise level in her bedroom at seventy to seventy-five decibels when the compressor and fans are operating. More noise occurs when trucks parked outside the facility run their cooling units all night.

[¶ 5.] The classification of the current central business district was adopted in 1970 through the Pierre City Ordinances. The purpose of the 1970 ordinance was to provide for the widest range of retail and service establishments in the area. In 1999, however, the city adopted a more detailed statement of purpose for the central business ·district, narrowing the range of permitted uses.[1] The apartment build-

---

1. The city's ordinance provides:

The following principal uses and structures

ing Atkinson lives in was permitted in the district as a conditional use.

[¶ 6.] Since Ellwein's purchase, Tour Ice has not changed the nature of its business, although it has expanded its infrastructure. In 1993, the city granted Ellwein a building permit for an addition. In 1997, Ellwein purchased lots adjacent to the existing building, and, at a cost of $100,000, a new metal building was attached to the existing structure. At that time, the city again issued a building permit, allowing Ellwein to add on to the building. Improvements to the site included the installation of additional cooling fans, a refrigerator and compressor unit, and two large ice making machines. Along with its expansion, the company's activities have created an increased level of noise. Under the 1999 zoning ordinance amendments, however, Tour Ice was considered a permitted use because it was a longstanding business in the area. Accordingly, the company was not required to apply to the city for non-conforming use status by obtaining a variance for either its use or its building.

[¶ 7.] After its second building addition in 1997, Atkinson complained directly to Tour Ice's management. Then she delivered a petition to the owner signed by eight neighbors. In response, the company's attorney sent Atkinson a letter stating that the business conforms to the city's zoning ordinances. Subsequently, the city issued its own letter, explaining that the company was operating as a preexisting business within the zoning district. Atkinson protested to the Pierre City Council, but to no avail.

[¶ 8.] Atkinson brought suit against Tour Ice alleging that its business activities constitute a nuisance and that it violates city zoning laws. She sought to prohibit the business "from operating a manufacturing plant, a storage depot, and a wholesale business[.]" She also asked for an injunction against noise during non-business hours. Her suit against the city sought a writ of mandamus to make the city enforce its ordinances against Tour Ice. In trial, the company's owner, Stephen Ellwein, conceded, "Just so ... everybody understands what we are talking about, we manufacture ice. I mean, that's a given." Following a court trial, the circuit court found in favor of Tour Ice and the city, ruling that the business was a permitted preexisting use because it predated the 1999 ordinance and was in compliance with the 1970 zoning ordinance. Atkinson now appeals, raising the following issues for our review: (1) whether the circuit court's determination that Tour Ice's activities did not constitute a nuisance was palpably unreasonable; (2) whether the zoning ordinances

are permitted in the Central Business District: (1) Financial institution[;] (2) Hotel/Motel[;] (3) Municipal or government buildings[;] (4) Office[;] (5) Parking facility or lot[;] (6) Personal and health service store[;] (7) Public transportation facility[;] (8) Public utility facility[;] (9) Railroad thru and spur tracks[;] (10) Retail or service store[;] and (11) Other light retail and service establishments approved by the Planning Commission, except those uses enumerated in another district. PIERRE CITY ORD. § 12–6–103 (1999). "The following principal uses are hereby declared incompatible with the purpose of the central business district and are hereby expressly excluded. (1) Drive-in theaters[;] (2) Warehouses[;] (3) Petroleum bulk storage[;] (4) Mobile home parks[;] and (5) One and Two-family dwellings." PIERRE CITY ORD. § 12–6–104 (1999). The following uses are conditional uses and require a permit pursuant to the 1999 amendments to the ordinances: "(1) Assembly and packaging[;] (2) Automotive sales, service, & storage[;] (3) Daycare Facility[;] (4) Gas Dispensing Station[;] (5) Mixed business/residential use[;] (6) Multiple family dwellings[;] (7) Mini-storage facility (4,000 sq. ft. or less)." PIERRE CITY ORD § 12–6–106 (1999).

were properly interpreted; (3) and whether the circuit court abused its discretion in denying her requested writ of mandamus.

### Standard of Review

[¶ 9.] Because cities have the power to declare nuisances, their decisions should be upheld unless they are " 'palpably unreasonable.' " *Union County v. Hoffman,* 512 N.W.2d 168, 170 (S.D.1994) (quoting *Town of Colton v. South Dakota Cent. Land Co.,* 25 S.D. 309, 312–13, 126 N.W. 507, 508 (1910)); SDCL 9–29–13. We will not set aside a trial court's findings of fact unless they are clearly erroneous. *Hoffman,* 512 N.W.2d at 170. " 'A finding is "clearly erroneous" when after reviewing all of the evidence, we are left with a definite and firm conviction that a mistake was made.' " *Id.* (citation omitted).

[¶ 10.] "We interpret zoning laws according to the rules of statutory construction and any rules of construction included in the enactments themselves." *City of Marion v. Rapp,* 2002 SD 146, ¶ 5, 655 N.W.2d 88, 90 (citing *Cole v. Bd. of Adjustment of Huron,* 2000 SD 119, ¶ 7, 616 N.W.2d 483, 485; *Cordell v. Codington County,* 526 N.W.2d 115, 117 (S.D.1994)). "The interpretation of an ordinance presents a question of law reviewable de novo." *Id.* (referencing *Even v. City of Parker,* 1999 SD 72, ¶ 8, 597 N.W.2d 670, 673). We review the grant or denial of a writ of mandamus for abuse of discretion. *Lang v. Western Providers Physician Org., Inc.,* 2004 SD 107, ¶ 7, 688 N.W.2d 403, 406 (citing *Black Hills Cent. R.R. Co. v. City of Hill City,* 2003 SD 152, ¶ 9, 674 N.W.2d 31, 34).

### Analysis and Decision
#### A. Nuisance

[¶ 11.] Atkinson argues that the "inaction by the City of Pierre towards the noise created by Tour Ice [is] palpably unreasonable." She maintains that the business should be declared a nuisance. Its operation, Atkinson asserts, unreasonably violates, invades, and interferes with her private use and enjoyment of her leasehold interest in her apartment.

[¶ 12.] "[A] claim for nuisance may be brought under statutory or common law nuisance theories." *Collins v. Barker,* 2003 SD 100, ¶ 16, 668 N.W.2d 548, 553. Nuisance is defined in SDCL 21–10–1:

A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either:

(1) Annoys, injures, or endangers the comfort, repose, health, or safety of others;

(2) Offends decency;

(3) Unlawfully interferes with, obstructs, or tends to obstruct, or renders dangerous for passage, any lake or navigable river, bay, stream, canal, or basin, or any public park, square, street, or highway;

(4) In any way renders other persons insecure in life, or in the use of property.

In SDCL 21–10–3, the Legislature differentiates between public and private nuisances: "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal. Every other nuisance is private." Available remedies against nuisances are: "(1) A civil action; (2) Abatement; and (3) In cases of public nuisance only, the additional remedy of indictment or information as prescribed by statute and rules relating thereto." SDCL 21–10–5.

[¶ 13.] The RESTATEMENT SECOND OF TORTS sets forth the common law elements required to establish a private nuisance cause of action, which this Court recognized in *Kuper v. Lincoln–Union Electric Company*, 1996 SD 145, ¶ 49, 557 N.W.2d 748, 761. *See Collins*, 2003 SD 100, ¶ 17, 668 N.W.2d at 554; RESTATEMENT (SECOND) OF TORTS §§ 822, 824–25 (1979). Under the RESTATEMENT, the following conduct gives rise to a claim of nuisance:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

RESTATEMENT (SECOND) OF TORTS § 822 (1979). "The conduct making an actor liable 'may consist of (a) an act; or (b) failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate ... the invasion of the private interest.'" *Collins*, 2003 SD 100, ¶ 17, 668 N.W.2d at 554 (quoting RESTATEMENT (SECOND) OF TORTS § 824 (1979)). "An actor's invasion is considered 'intentional if the actor (a) acts for the purpose of causing it, or (b) knows that it is resulting or is substantially certain to result from his conduct.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 825 (1979)).

[¶ 14.] In his testimony, the owner of Atkinson's apartment complex, Harvey Buhl, said that Atkinson complained to him once, but that no other tenants complained. He explained that the building in which Atkinson resides has the highest occupancy rate of all Buhl's residential rental properties, notwithstanding Tour Ice's location across the street.

[¶ 15.] Kathy Arnold testified that she has lived in the same apartment building on the second floor for seven years. Even when she left her windows open, she said Tour Ice had never inconvenienced her or her family, and the company's operations were not noticeable. Mayor Dennis Eisnach of the City of Pierre also testified. He confirmed that no other complaints from any other residents around the ice facility were filed. He recalled that upon learning of the nuisance complaint, he ensured that city officials were in compliance with the ordinances and confirmed that the officials were doing what was required of them.

[¶ 16.] In its findings of fact, the circuit court found "no evidence that indicates that Tour Ice is operating improperly or negligently." The court also suggested to Atkinson that since she always has her windows open throughout the year, she could decrease her exposure to the noise by closing them. With regard to the degree of noise, the court found that the decibel level was "in the top of the normal range but no where near a danger reading." [2]

■ [¶ 17.] Although two others from the apartment complex besides Atkinson testified in accord with her position, under

---

2. To reach their conclusion that this noise constitutes a nuisance, the dissenters invoke certain EPA criteria they apparently downloaded from the Internet, from a website called "Noise Pollution Clearinghouse." However, these materials state that they do "not constitute a standard, specification, or regulation." And, in fairness, it must be pointed out that these materials were never presented to the trial court and thus were never considered by the court. To introduce this material now and use it as evidence to reverse the trial court is a violation of SDCL 15–26A–10 ("Supreme Court may review all matters appearing *on the record* ....") (emphasis added).

our standard of review and applying the foregoing legal analysis, we cannot say that the circuit court's fact findings were clearly erroneous or that its legal conclusions were in error when it concluded that Tour Ice's operation did not constitute a nuisance. SDCL 9–29–13 provides: "Every municipality shall have power to declare what shall constitute a nuisance and prevent, abate, and remove the same." Within a city's express authority is the implied power to declare what shall not constitute a nuisance. We cannot say that the city's refusal to declare Tour Ice's operation a nuisance was palpably unreasonable. Moreover, we can find no error in the court's refusal to declare the business a private nuisance.

## B. Interpretation of Zoning Ordinances

[¶ 18.] Atkinson argues that city officials failed to properly interpret the applicable zoning ordinances. Because Tour Ice produces, packages, stores, and delivers ice from its premises, Atkinson contends that its business activities are impermissible in the central business district zoning area. Referring to the 1999 amendments to the city zoning ordinances, she asserts that the central business district only permits assembling and packaging businesses as a conditional use. Tour Ice never obtained a conditional use permit for such use, and therefore she contends it cannot continue to operate.

[¶ 19.] Tour Ice began its operation in 1973. Thus it was subject to the 1970 version of the city's zoning laws. When it moved to its new location within the same district in 1991, the city interpreted its ordinances to the effect that the company was not required to seek a variance or conditional use permit. The 1999 amendments would not apply to it because under those amendments Tour Ice's operation constituted a nonconforming use allowed to continue as long as it was in compliance with prior zoning restrictions.[3] *See Rapp*, 2002 SD 146, ¶ 6, 655 N.W.2d at 90 (citing SDCL 11–6–39). Furthermore, the building permits it sought were before the enactment of the 1999 amendments. Accordingly, even if the operation can accurately be described as an assembling and packaging business, the applicable 1970 zoning laws would not preclude it.

[¶ 20.] Atkinson next argues that Tour Ice is a warehouse. Under the 1970 version of the city zoning ordinances, warehouses are prohibited in the central business district. PIERRE CITY ORD. § 12–6–104 (1970). If it is a warehouse, then it would have required a variance. It never received one. According to the testimony, the company's process is to produce, package, and store ice until it is ready for delivery. The circuit court found that "Tour Ice sells all the ice it makes each night and stores ice in a real warehouse in Sturgis, South Dakota."[4] From our re-

---

**3.** As defined in PIERRE CITY ORD. § 12–1–101(13), an "existing building" is "a building erected prior to the adoption of this chapter or one for which a legal building permit has been issued." Because the company's building was constructed before the 1999 amendments, Tour Ice has been operating in the central business district as a valid existing building.

**4.** In its memorandum opinion, which was incorporated into its findings of fact and con-

clusions of law, the circuit court ruled that under PIERRE CITY ORD. § 12–6–104, warehouses are specifically excluded from the central business district. Nonetheless, as the circuit court noted, "at least two warehouses exist in close proximity to Tour Ice" and Atkinson's apartment building, both of which are within the same zoning district. Kusler's Beer Distributing and Monick Pipe and Supply are considered wholesale businesses, and both operate warehouses. However, we do not know from the record whether these estab-

view of the record, we think the court's finding can be supported as not clearly erroneous. City zoning laws do not define the term warehouse, but the ordinary understanding of the term suggests a building or structure designed primarily for storage. That is not the purpose of the building here. It is used to make ice that is stored until shipment, usually the next day.

[¶ 21.] A more difficult question is whether the business can be characterized as manufacturing. Manufacturing businesses are not permitted in the central business district because, under PIERRE CITY ORD. § 12–6–103 (1970), such district may contain "other light retail and service establishments approved by the Planning Commission, except those uses enumerated in another district." Manufacturing is a use specifically enumerated in the light industrial district. In defining his business, Ellwein candidly admitted, "we manufacture ice ... that's a given."

[¶ 22.] Before moving to its current location, Tour Ice, operating under its former owners, applied for a building permit for 430 South Henry Street. The permit application shows that the proposed use for the building was for "ice manufacturing." A notation on it states that it was seeking a "special permit for ice manufacture." According to the city's building official, Norm Weaver, when the city approved the permit it was only for the building structure which before that time had not met the building codes. But the use of the building for making ice may have required a variance, which the former owners never obtained. Whether a vari-

ance is required rests on the meaning of the word "manufacture."

[¶ 23.] In most instances, we would simply resort to the definition provided in the zoning ordinance, but the 1970 version of Pierre's ordinance does not define the term.[5] A few courts have addressed the question whether the production of ice is manufacturing, usually in the context of taxation. The Louisiana Supreme Court held that the production of ice by artificial means constitutes manufacturing. *Ballard v. Kentwood Ice Mfg. & Bottling Works, Ltd.*, 147 La. 583, 85 So. 598, 599 (1920). In *Ballard,* the court, without expressing any rationale, held that a business that made and sold ice, meal, ice cream, soda water, and pop, and converted hogs into pork products was a manufacturer. In *dicta* in *People v. Knickerbocker Ice Co.,* 99 N.Y. 181, 1 N.E. 669 (1885), the court distinguished between the artificial production of ice and the collection and distribution of river ice, explaining, "No doubt ice may be manufactured and frigorific effects produced by artificial means. Corporations exist for that purpose, and come literally within our manufacturing laws." *Id.* at 670. *See also Attorney General v. Belle Isle Ice Co.,* 59 Mich. 157, 26 N.W. 311 (1886) (naturally formed ice collected and reduced by manual labor and machinery to a form adapted for sale and use is "manufactured").

[¶ 24.] On the other hand, the Pennsylvania Supreme Court held to the contrary. In *Commonwealth v. American Ice Co.,* 406 Pa. 322, 178 A.2d 768 (1962), the court ruled that the artificial production of ice on a commercial basis did not constitute man-

---

lishments predated applicable zoning ordinances or received variances.

**5.** The 1999 amended version defines light manufacturing as "those manufacturing processes that are not obnoxious due to dust, odor, noise, vibration, pollution, smoke, heat

or glare. These commercial or industrial uses are characterized by generally having all aspects of the process carried on within the building itself." PIERRE CITY ORD. § 12–1–101(56) (1999).

ufacturing. Because there is no lasting change when water is frozen, the court reasoned:

> Ice is not a new article. It is still what it was originally—water. In fact, if it is allowed to remain in a warm temperature it reverts to water without any human or mechanical interposition. This cannot be said of any product which is generally accepted to be a manufactured product.... The appellant argues that since, through the process which it applies to water, water acquires a new shape, the resulting product must, therefore, be a manufactured article, but the new shape which we find in a manufactured article must be a permanently new shape.

*Id.* at 771–72. *See also Armour & Co. v. Pittsburgh,* 363 Pa. 109, 69 A.2d 405, 409 (1949) (same holding).

 [¶ 25.] Given this division of opinion among courts, all we need to ask is whether the city's interpretation of its own ordinance is unreasonable. As the circuit court wrote, "[a]lthough making ice also could arguably be categorized as 'manufacturing,' the city official's interpretation that making ice is not manufacturing will not be disturbed where the existing use by Tour Ice predates the 1999 ordinance." The term was not defined in the 1970 version of the ordinance. To now impose a court-made definition would have the effect declaring unlawful an existing thirty-two year business. We would be supplying a meaning to a word in the ordinance that the city has never given to it. "Zoning laws may not operate retroactively to deprive property owners of prior vested rights by preventing a use that was lawful before the enactment of the zoning laws." *Rapp,* 2002 SD 146, ¶ 6, 655 N.W.2d at 90.

 [¶ 26.] Even if we were to declare today that the making of ice constitutes manufacturing as that term is used in the Pierre zoning ordinances, we would exceed the powers granted under the writ of mandamus to require Tour Ice to cease or curtail operations. A "writ of mandamus may be issued ... to compel the performance of an act which the law specially enjoins as a duty...." SDCL 21–29–1. "Mandamus is a potent, but precise remedy. Its power lies in its expediency; its precision in its narrow application. It commands the fulfillment of an existing legal duty, but creates no duty itself, and acts upon no doubtful or unsettled right." *Sorrels v. Queen of Peace Hosp.,* 1998 SD 12, ¶ 6, 575 N.W.2d 240, 242. Mandamus can only issue when the duty to act is unequivocal. *Black Hills Cent. R.R. Co.,* 2003 SD 152, ¶ 13, 674 N.W.2d at 34. With the lack of a definition in the city's zoning ordinance and the difference of opinion on whether ice making is a manufacturing operation, the city's duty to act is hardly unequivocal.

[¶ 27.] We have a business here that has always acted with the city's formal blessing. As the circuit court reasoned, "Tour Ice received building permits from the City of Pierre for the construction of additional facilities on the location," and in doing so, the company was authorized to expand its business. If the city issued those building permits in violation of its public or official duty, mandamus still would not lie to compel the undoing of a completed act. *See Crowley v. Spearfish Indep. Sch. Dist.,* 445 N.W.2d 308, 311 (S.D.1989); *Beresford Indep. Sch. Dist. v. Fletcher,* 66 S.D. 500, 287 N.W. 497, 498 (1939). We think the circuit court correctly denied relief.

[¶ 28.] Atkinson raises several other issues which either lack sufficient merit for discussion or were not raised at the time of

trial.[6] Thus, we decline to address them. *Knudson v. Hess*, 1996 SD 137, ¶ 8, 556 N.W.2d 73, 75.

[¶ 29.] Affirmed.

[¶ 30.] GILBERTSON, Chief Justice, concurs.

[¶ 31.] ZINTER, Justice, concurs specially.

[¶ 32.] SABERS and MEIERHENRY, Justices, dissent.

ZINTER, Justice (concurring specially).

[¶ 33.] I concur and write to highlight two points.

[¶ 34.] First, although the dissents spend numerous pages discussing facts that could support a finding of unreasonable noise (a nuisance), Judge Gors listened to the opposing witnesses, found their credibility more persuasive, and ultimately found for Tour Ice on this issue. Therefore, although the dissents' selection[7] of facts may appear to make a case for a nuisance, this appellate retrial of facts is not permitted under our well-established standard of review. *Union County v. Hoffman*, 512 N.W.2d 168, 170 (S.D.1994); *Hilde v. Flood*, 81 S.D. 25, 28–29, 130 N.W.2d 100, 101–02 (1964). *See also* SDCL 15–6–52(a) ("[D]ue regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

[¶ 35.] Second, the dissents disregard our standard of review in their interpretation and application of the dispositive zoning ordinance. Plaintiff's amended complaint is specifically premised on 1970 City of Pierre Ordinance # 845. Plaintiff argues that the 1970 ordinance prohibited this building (including the additions) and its use by Tour Ice from the business's inception in 1973 until revised ordinances were adopted in 1999. Plaintiff argues (and the dissents agree) that the building and the business use were unlawful nonconforming uses before the 1999 ordinance was adopted, and therefore, the building and its use could not have been lawfully "grandfathered" under the 1999 ordinance now in effect.

[¶ 36.] In analyzing this issue, the dissents attempt to interpret and apply the 1970 municipal zoning ordinance differently than the City and the trial court. The problem with their analysis is that there is no evidence of the language of that ordinance in the record. The ordinance is not in the record because Plaintiff failed to introduce it at trial[8] despite the trial

---

**6.** Atkinson's brief argues that (1) the city's building inspector, Weaver, was operating under a conflict of interest, which enticed him to make an arbitrary and capricious decision; (2) the City of Pierre inappropriately delegated power to the building inspector; and (3) her due process rights were violated.

**7.** The dissents do not even acknowledge the witnesses who testified that the noise was not burdensome.

**8.** Plaintiff did not introduce *any* Pierre City ordinance into evidence. The City only introduced Exhibit C, which is a recent codification of selected ordinances. Although the recent codification's source notes refer to a number of ordinances adopted in 1970, it is impossible to ascertain from Exhibit C which ordinances were in effect in 1970 and which were in effect in 1999. Moreover, there is no reference to 1970 Ordinance # 845.

Plaintiff also failed to attach a copy of the crucial 1970 ordinance or the 1999 ordinances to her appellate brief. Nevertheless, Plaintiff makes numerous allegations concerning the content of these ordinances, including specific references to "the 1970 ordinance (Ordinance # 845)." Even though we have occasionally considered ordinances that were not introduced but were set forth in the brief, we cannot do so here because plaintiff did neither. *See Coyote Flats, L.L.C. v. Sanborn County Com'n*, 1999 SD 87, ¶ 9 n. 5, 596 N.W.2d 347, 350 n. 5.

court's explicit admonition to do so.[9] Although we cannot read the 1970 ordinance on appellate review, the dissent divines its language from a *question* asked by Plaintiff's counsel concerning "restricted use[s]." *See infra* ¶ 63 n. 19. This does not, however, answer the question concerning conditional, permitted, and grandfathered uses under all of the ordinances. Moreover, the dissent ignores the zoning official's answer indicating that the City believed "the use was previously permitted." *Infra* ¶ 63 n. 19. The zoning official further expressly opined that this business was not prohibited in the central business district.

[¶ 37.] Considering this evidence and Plaintiff's failure to introduce the 1970 ordinance, our standard of appellate review requires us to defer to the interpretation of the City and the trial court. This Court has consistently held that: "Absent statutory authorization, courts of general jurisdiction, such as our circuit courts, may not take judicial notice of municipal ordinances.... *An ordinance therefore must be introduced into evidence and be made part of the record." Nase v. Christensen,* 409 N.W.2d 131, 132 (S.D.1987) (citations omitted). *See also Coyote Flats, L.L.C. v. Sanborn County Com'n,* 1999 SD 87, ¶ 9 n. 5, 596 N.W.2d 347, 350 n. 5. Because the dispositive 1970 ordinance was not introduced into evidence or made a part of the record, we are required to presume that the circuit court interpreted the ordinances correctly.[10] This Court has been unequivocal in holding that "[t]he settled record is the sole evidence of the circuit court's proceedings and, when confronted with an incomplete record, our presumption is that the circuit court acted properly." *State v. Jones,* 416 N.W.2d 875, 878 (S.D.1987). Stated in other words, "[i]f we draw any presumption from an incomplete settled record, the presumption is that the trial court acted properly." *State v. Hall,* 272 N.W.2d 308, 311 (S.D.1978).

[¶ 38.] Appellate courts are also required to give this deference to the City's interpretation. For over thirty years, the City has interpreted and applied the 1970 and 1999 ordinances to allow this building, its various additions,[11] and its use.

**9.** Plaintiff's trial counsel, who withdrew for this appeal, was apparently unaware of the well-established rule of law requiring proof of municipal ordinances. When the trial court told Plaintiff's counsel that the ordinances must be offered into evidence, counsel responded by suggesting there was no need to introduce them because the ordinances were "plead (sic) and they are set out verbatim in my trial brief." The trial court responded, "I understand, but you got to prove them too." Notwithstanding this admonition, Plaintiff failed to prove the contents of the 1970 Ordinance, the 1999 ordinances, or any other City ordinance that supports her claim.

**10.** As we noted in *Coyote Flats, L.L.C.,* 1999 SD 87, ¶ 9 n. 5, 596 N.W.2d at 350 n. 5, whether to "take judicial notice of a municipal ordinance is a procedural issue.... Therefore, if it is not objected to on the record, it can be waived upon appeal just as any other procedural issue." Thus, absent an objection, we have reviewed an ordinance attached to a brief but not admitted into evidence. *See id.* Here, the 1970 ordinance was apparently attached to Plaintiff's trial court brief. It also appears that Defendants did not object to the trial court's consideration of that copy. Therefore, the trial court could, absent an objection, interpret and apply the ordinance that was attached to Plaintiff's brief. However, the trial briefs are not part of our record, and absent any evidence of the content of the ordinance, our standard of appellate review precludes our interpretation of the ordinance and requires that we defer to the City's and the trial court's interpretation.

**11.** Although expansions of nonconforming uses are generally not permitted, *see Brown County v. Meidinger,* 271 N.W.2d 15, 18 (S.D. 1978), there is no dispute that the *relevant* building additions were completed before the 1999 ordinances became effective, and the

"[C]ourts will consider and give weight to the construction of the ordinance by those administering the ordinance." *Wegner Auto Co., Inc. v. Ballard,* 353 N.W.2d 57, 58 (S.D.1984). These rules of deference are dispositive in this case because we are being asked to interpret ordinances that we cannot read.

[¶ 39.] Considering Plaintiff's failure to prove the contents of any ordinance, we are required by our standard of review to presume that the City and the trial court interpreted and applied the ordinances correctly. Under those interpretations, this use was either a conforming or permitted use from 1973 until 1999, when it was "grandfathered" by the 1999 ordinance. I find it quite remarkable that the dissents would overrule these interpretations without being able to read the relevant ordinances.

SABERS, Justice (dissenting).

[¶ 40.] I respectfully dissent because the majority opinion fails to consider the relevant facts of the nuisance action and avoids the plain meaning of the word "manufacture" resulting in numerous mistakes and a wrongly decided opinion.

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for

abnormally dangerous conditions or activities.

*Collins v. Barker,* 2003 SD 100, ¶ 17, 668 N.W.2d 548 (citing RESTATEMENT (SECOND) OF TORTS § 822 (1979)).[12] "The conduct making an actor liable may consist of (a) an act; or (b) failure to act under the circumstances in which the actor is under a duty to take positive action to prevent or abate ... the invasion of the private interest." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 825 (1979)). "An actor's invasion is considered intentional if the actor (a) acts for the purpose of causing it; or (b) *knows that it is resulting or is substantially certain to result from his conduct.*" (emphasis added).

[¶ 41.] The circuit court found that the fans and compressors of Tour Ice create noise at random "24 hours per day 7 days per week." Conveyor noise is made whenever the conveyor is running. Semi trucks are loaded with ice between the hours of 5:00 a.m. to 7:00 a.m. Monday through Friday, some Saturdays, and occasionally on Sundays and holidays.

[¶ 42.] Atkinson presented decibel readings taken at night with a digital hand held sound meter. The circuit court admitted the meter readings into evidence and incorporated them into its findings of fact. The court found that the noise in Atkinson's apartment was generally in the 70–75 decibel range.[13] At most, the court found that the noise in Atkinson's apartment was comparable to that created by "a freight train." On average, the court

---

City interpreted the additions to be permitted uses.

12. The evidence is sufficient to find a nuisance under either statutory nuisance as defined in SDCL 21–10–1 or common-law nuisance.

13. As the circuit court accurately pointed out, a decibel or "dBA" is a unit for measuring sound levels, approximately equal to the smallest difference in loudness detectable by the human ear. The range runs from one dBA, the faintest audible sound, to 130 dBA, the loudest audible sound. *Souders v. Washington Metropolitan Area Transit,* 48 F.3d 546, 548 n. 1 (D.C.Cir.1995).

found that the noise level was that of a "vacuum cleaner." Despite those findings, the circuit court denied relief finding that "the world is not silent."

[¶ 43.] The Environmental Protection Agency, in a report on noise control, noted that "undue interference with activity and annoyance will not occur if ... indoor levels [of noise] ... are maintained at an energy level of 45 dB." [14] *See Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety,* (EPA 1974) at http//www.nonoise.org/library/levels74/levels74.htm.[15]

[¶ 44.] The trial court failed to consider that noise levels double every ten decibels. *Mid States Coalition for Progress v. Surface Transp. Bd.,* 345 F.3d 520, 535 (8thCir.2003). Fifty-five decibels, therefore, is twice as loud as forty-five decibels. Consequently, the noise in Atkinson's apartment at 70–75 decibels is about six to eight times the level that the EPA determines would be free from "annoyance" and "interference." Clearly, it is a nuisance.

[¶ 45.] Other residents from Atkinson's apartment complex also testified about the noise from Tour Ice.

[¶ 46.] Tom Cline, whose apartment faces Tour Ice, remarked:

But with the noise from that compressor, which is a—which is not a noise you get used to because it's a constant. It's an off thing you can't get used to. I can't get used to it at least. The compressor runs for a period of time and then it turns off and you're laying there trying to go to sleep and you say, "My God ain't this nice," you know. And you no more just about say "I'm ready to go to sleep," and that thing kicks on again.

Cline compared the noise of the Tour Ice fans with that of a C–130 aircraft.[16]

[¶ 47.] Mary Conode's bedroom faces the compressor unit of Tour Ice. She testified that she was "awakened" at 4:15 a.m. every morning in the summer of 2003. Additionally, she testified that Tour Ice has not gotten any quieter in the three years she has lived in her apartment.

[¶ 48.] Stephen Ellwein, the majority owner of Tour Ice, admitted that his business is noisy. When asked whether he found anything objectionable about Atkinson's position, Ellwein responded, "Well ... we do generate noise." Ellwein testified that the semi trucks were the noisiest aspect of the business.

[¶ 49.] It is clear that the noise generated by Tour Ice is an unreasonable interference with Atkinson's leasehold. People

14. The EPA explains that these numbers are not to be regarded as rigid standards, but a recommendation of what the agency believes "are requisite to protect the public from adverse health and welfare effects."

15. The majority opinion claims it is unfair to examine E.P.A. studies on noise levels because "... these materials were never presented to the trial court and thus were never considered ..." by it. The trial court's written decision, however, is laden with opinions and factual findings as to what constitutes appropriate decibel levels. The trial court went so far as to rely on expert testimony, reproduced in an Alabama appellate case, as to what decibel range is normal for communi-

ties. As explained in ¶ 12 *supra,* the trial court misread the case upon which it relies.

Because the trial court made extensive scientific findings as to appropriate sound levels, it is not "unfair" to examine whether those findings were consistent with the report of a federal agency on the same subject matter. In fact, the Eighth Circuit has referenced the same materials in determining whether an agency's methodology pertaining to noise calculations was arbitrary and capricious. *Mid States,* 345 F.3d at 537. Clearly it was fair game.

16. The C–130 Hercules is a massive transport plane utilized by the United States Air Force.

should not be expected to live or sleep through noise that is comparable to vacuum cleaners or freight trains. The circuit court erred as a matter of law when it held that the noise generated by Tour Ice does not constitute an unreasonable interference.[17]

[¶ 50.] The circuit court relied on *Patterson v. Robinson* to support its holding. 620 So.2d 609 (Ala.1993). Specifically, the court cited *Patterson* for the proposition that "60 to 70 decibels are in the normal range for communities." Thus, the circuit court found that Atkinson's 70–75 reading was "in the top of the normal range but nowhere near a danger reading."

[¶ 51.] A closer reading of *Patterson* demonstrates that the trial court's reliance is flawed. First, the 60–70 normal range for communities is the standard when measured *outdoors*. Indeed, the Supreme Court of Alabama upheld the trial court's order directing the defendants to keep noise at a 78 decibel standard outside the plaintiff's home and a *58 decibel standard indoors*. *Patterson*, 620 So.2d at 612. Atkinson, on the other hand, had readings between 70–75 decibels *inside* her apartment. (emphasis added). As a result, the circuit court's finding in this regard is clearly erroneous.

[¶ 52.] Second, the "danger zone" referred to by the circuit court was the decibel level in which safety standards are triggered in an *industrial setting*. A requirement that noise approach "the industrial danger zone" before constituting an unreasonable interference has no place in the residential setting. To require the noise in one's bedroom to reach a level where OSHA would be recommending ear plugs for an assembly line worker is error.

[¶ 53.] Third, the noise in Atkinson's apartment is about six to eight times the permissible level that the EPA determines would be free from "annoyance" and "interference."

[¶ 54.] In summary, Atkinson has met her burden of proof on the nuisance claim and is entitled to a remedy. The circuit court's finding regarding 70–75 decibels to be in "the top of the normal range" is clearly erroneous because it misconstrued the decibel level and *Patterson*. The trial court's requirement that noise reach the industrial danger zone should not apply to private residences in a nuisance action. As a result, the circuit court erred as a matter of law when it did not find the City's determination of the existence of a nuisance to be "palpably unreasonable."[18]

**Interpretation of Zoning Ordinances**

[¶ 55.] "We interpret zoning laws according to the rules of statutory construction and any rules of construction included in the enactments themselves." *City of Marion v. Rapp*, 2002 SD 146, ¶ 5, 655 N.W.2d 88, 90 (citing *Cole v. Bd. of Adjustment of City of Huron*, 2000 SD 119, ¶ 7,

17. The concurring opinion claims I am conducting "an appellate retrial of the facts." The concurrence fails to recognize that, for the most part, I am simply *restating* the trial court's findings of fact. As outlined in ¶¶ 2 and 3, *supra*, the trial court found the following facts: (1) on average, the noise in plaintiff's apartment is comparable to that of "a vacuum cleaner;" (2) noise levels in plaintiff's apartment occasionally reach the same noise level as that of a "freight train," and (3) the noise is generated at random, "24 hours per day 7 days per week."

I am not retrying the facts, I am relying on them. The facts show that the trial court's legal determination was in error. No resident of any South Dakota city should have to tolerate the level of noise found by the trial court.

18. The record reflects that Atkinson met her burden on the *intentional* element. Ellwein was put on notice on numerous occasions that his company's actions were causing excess noise in Atkinson's apartment.

616 N.W.2d 483, 485). "The interpretation of an ordinance presents a question of law reviewable de novo." *Id.* "When interpreting an ordinance, we must assume that the legislative body meant what the ordinance says and give its words and phrases *plain meaning* and effect." *In re Frawley Planned Unit Development*, 2002 SD 2, ¶ 6, 638 N.W.2d 552, 554 (emphasis added).

[¶ 56.] Manufacturing businesses are not permitted in Pierre's central business district. *Pierre City Ord.* § 2–6–103 (1970). The 1970 ordinance, however, does not define the term "manufacture." Tour Ice has not received a variance from the City of Pierre to manufacture ice in the district. Thus, if Tour Ice is a "manufacturing" business, it is operating unlawfully.

[¶ 57.] Because the term "manufacture" is undefined by the zoning ordinance, we must give it its plain and ordinary meaning. *Frawley Planned Unit Development*, 2002 SD 2, ¶ 6, 638 N.W.2d at 554. THE AMERICAN HERITAGE DICTIONARY defines the term manufacture as "to make or process (a product), esp. with industrial machines." 826–27 (3rd ed 1997). Neither the trial court nor the majority opinion claims that ice is not a "product."

[¶ 58.] In regards to industrial operation, Tour Ice uses machines to freeze water and package it into both block and cube form. The process is performed with fans, conveyors, compressors, etc. Tour Ice produces, packages, and ships approximately 100,000 pounds of ice per day. Undoubtedly, Tour Ice is engaged in manufacturing ice in the plain and ordinary sense of the word "manufacture."

[¶ 59.] Instead of adhering to our long-standing principles of statutory interpretation, the majority opinion meanders back through the decades to find two obscure tax cases that examine the word "manufacture" as used in tax codes. *See Ballard v. Kentwood Ice Mfg. & Bottling Works, Ltd.*, 147 La. 583, 85 So. 598 (1920) (business that makes and sells ice is a manufacturer and therefore exempt from license tax.); *Commonwealth v. American Ice Co.*, 406 Pa. 322, 178 A.2d 768 (1962) (foreign corporations engaged in making ice were not entitled to "manufacturer's" franchise tax exemption.). The majority opinion concludes that since there is a "division among courts" the City's interpretation is not unreasonable.

[¶ 60.] The majority opinion's holding ignores the plain meaning of "manufacture" and is devoid of common sense. Ellwein certainly believed Tour Ice was in the manufacturing business. At trial, Ellwein testified that "we [Tour Ice] manufacture ice. I mean, that's a given." When asked about the noise generated by Tour Ice, Ellwein remarked, "the manufacturing itself isn't the noisy part, it's the cooling[.]" In describing the entire process, Ellwein testified, "after we manufacture the ice the ice is held in freezers." Therefore, Tour Ice is not only manufacturing unlawfully in the central business district, but is unlawfully warehousing as well.

[¶ 61.] Richard Melcher, the prior owner of Tour Ice, believed Tour Ice was in the manufacturing business as well. Melcher had to apply for a building permit before Tour Ice moved to its current location. In two places on the permit application Melcher conspicuously wrote that he was applying for a special permit for "ice manufacturing." *See copy of Plaintiff's Exhibit "1" attached hereto.*

[¶ 62.] Courts have used the word "manufacture" to describe the process of making and selling ice. *See Empire Storage & Ice Co. v. Giboney*, 357 Mo. 671, 210 S.W.2d 55, 55 (1948) (plaintiff "also manufactures and sells ice[.]"); *Jefferson Ice & Fuel Co. v. Grocers Ice & Cold Storage Co.*, 286 S.W.2d 80, 81 (1955) ("Both of

these companies are in the business of manufacturing ice."); *Hebert v. Loveless,* 474 S.W.2d 732, 733 (Tex.Civ.App. 1971) ("The ice was manufactured by the defendant ice company...."); Justice Sutherland, writing for the United States Supreme Court, remarked, "It has been said that the manufacture of ice requires an expansive plant beyond the means of the average citizen...." *New State Ice Co. v. Liebmann,* 285 U.S. 262, 278, 52 S.Ct. 371, 76 L.Ed. 747 (1932). Justice Brandeis, writing in dissent, noted, "Nor can the Court properly take judicial notice that, in Oklahoma, the means of manufacturing ice for private use are within the reach of all persons who are dependent on it." *Id.* at 289, 52 S.Ct. 371.

[¶ 63.] Certainly Ellwein, Melcher, and the authors of these writings are not all semantically challenged. Instead, they were using the word manufacture in its plain and ordinary meaning. Only the Pennsylvania Supreme Court and, now the majority opinion, claim that the making of ice commercially is not "manufacturing."[19]

[¶ 64.] Because the city's interpretation is at odds with the plain meaning of the term "manufacture," the circuit court should be reversed on this issue. We should remand to the trial court to reach the correct decision and determine the proper remedy.

MEIERHENRY, Justice (dissenting).

[¶ 65.] I join Justice Sabers' dissent and write specially.

[¶ 66.] Atkinson has sufficiently established a basis for both a nuisance action against Tour Ice and a mandamus action against the City. The City should not get a free pass because it ignored the manufacturing nature of this business and its own zoning ordinances both before and after 1999.

[¶ 67.] First, no matter how the City wants to redefine the business of Tour Ice, it is clearly engaged in manufacturing. Not only does the owner openly admit he is in the business of manufacturing and

---

**19.** The concurring opinion avoids giving the term "manufacture" its plain and ordinary meaning. Instead, the concurrence would defer to the City's interpretation because Atkinson failed to introduce the 1970 ordinances into evidence and, according to the concurrence, "there is no evidence of that ordinance in the record." Concurrence ¶ 36. The concurrence claims that the rules of deference are therefore dispositive.

I do not agree that there is no evidence of the 1970 ordinance in the record. Norm Weaver, the city official charged with enforcing and interpreting zoning ordinances, engaged in the following exchange with plaintiff's counsel concerning the 1970 ordinances:
*Plaintiff's Counsel:* You've heard the discussion here regarding what was allowed or *what was restricted prior to the '99 changes* as *to manufacturing being a restricted use.* Do you regard the activities carried on by Tour Ice as being manufacturing as interpreted under the zoning ordinances?

*Weaver:* To us—and we—when Mr. Melcher moved ... we did not consider making ice manufacturing and, you know, the use was previously permitted and so we based all of our understanding, I guess, from—from that point on, and I guess we have not changed our mind.
Thus, Mr. Weaver does not dispute that the 1970 ordinances prohibited manufacturing in the central business district. Neither do any of the parties. Nor did the trial court. Nor does the majority opinion. Why in the world would the majority opinion strain to conclude making ice was not manufacturing if manufacturing was not prohibited by the ordinance? It is not necessary to reproduce the ordinance when no one disputes what it says.
Even if the City is afforded the highest degree of deference, its interpretation still fails to make basic sense. The freezing of water, cutting, packing, storing, and shipping of 100,000 pounds of ice per day constitutes manufacturing in the plain and ordinary sense of the word.

storing ice, but the evidence also supports that conclusion. Particularly telling is the owner's testimony in which he says, "Just [ ] so everybody understands what we're talking about, we manufacture ice. I mean, that's a given." Additionally, the application for a building permit clearly indicates that the "use of the building" was "ice manufacturing."

[¶ 68.] Second, whether the business is manufacturing, warehousing, or assembly and packaging, it is a nonconforming or excluded use under the City's zoning ordinances. In its brief, the City does not dispute that Tour Ice presents a nonconforming use. The trial court determined that the business activity fell within the zoning category of "assembly and packaging," which is a nonconforming use. In spite of this characterization, the court determined that the "conditional use permit [was] not needed [because] the existing use by Tour Ice predate[d] the 1999 ordinance," and that "[t]he City's interpretation that making ice is not manufacturing will not be disturbed where the existing use by Tour Ice predates the 1999 ordinance." The trial court reasoned that because the City has always failed to enforce the zoning ordinance, its present failure to enforce its ordinance is excused. Such reasoning is faulty. Grandfathering in a mistake should not justify enlarging the mistake at the expense of the citizens of the City. Additionally, this manner of applying prior existing use concepts is contrary to the City's Zoning Ordinance Section 12–1–110 and our previous holdings.

[¶ 69.] Section 12–1–110 allows a prior lawful use to continue but disallows "extension of the building for a non-conforming use." Additionally, we have consistently held that grandfathered nonconforming uses are not to be expanded. We said:

The policy towards nonconforming uses is to prevent their expansion beyond the bounds of the nonconforming use at the time of the effective date of the zoning ordinance. Even moderate expansion to meet new needs or to keep up with competition are (sic) generally not allowed. The policy aims toward eventual phaseout of nonconforming uses and seeks to do so as quickly as possible.

*Brown County v. Meidinger*, 271 N.W.2d 15, 18–19 (S.D.1978) (citations omitted).

[¶ 70.] Manufacturing was not a conforming use in this zone under any of the zoning ordinances—before or after the 1999 ordinances. At no time did the City grant the business a variance or use permit. In fact, on two occasions after 1999, the City allowed expansion of the facility—still not identifying the "use" of the business as a prohibited or non-conforming use. Regardless of whether this business is characterized as manufacturing, warehousing, or packing and assembling, it is not a conforming use. The City consequently has failed to enforce its own ordinances.

[¶ 71.] In its brief, the City admits that the remedy of a writ of mandamus is appropriate "when the duty to act is clear." The City, relying on *Hentz v. City of Spearfish*, argues that a writ cannot issue to undo a completed act. 2002 SD 74, 648 N.W.2d 338. The completed act, the City argues, is the granting of the building permit to Tour Ice on two occasions for expansion. Its own witness, however, testified that a building permit is not a substitute for a "use" permit under the zoning statutes.

[¶ 72.] The City is responsible for enforcing its own zoning ordinances. By failing to apply the ordinances, it has failed to act. Failure to act when a clear duty exists is a basis for mandamus. In order to avoid the City's duty, City officials overlooked the true nature of the business. The City official testified he had deter-

mined that the business was not a manufacturing business, that it was a permitted use in the central business district, and that it did not need a conditional use permit. When pressed, the City official said he did not know whether the expansion for which the building permits were issued presented warehouse-type scenarios. He said he called them "parking garages." The trial court rejected the official's characterization as a "parking garage" and determined, instead, the building's use was assembly and packaging. Consequently, even under the court's determination, it was a non-conforming use requiring a mandamus to issue.

[¶ 73.] The City's omission in this case harmed both the business owner and the neighbors. The neighbors were subjected to unlawful manufacturing noise; the business was subjected to a nuisance lawsuit. The underlying theory of a zoning plan is to prevent these kinds of actions. I would reverse and remand for the trial court to issue the writ against the City and to craft an appropriate remedy for the nuisance action.

Ex 1

PERMIT

N? 1039

**Building Department**
**CITY OF PIERRE**
*Applicant to fill in between heavy lines*

PERMIT FEE _____
PLAN CHECK FEE _____
TOTAL _____

Building Address _430_ _S. HENRY._
Locality _DOWNTOWN PIERRE_
Nearest Cross St. _MISSOURI AVE._

**Permitee**
Name _RICHARD MELCHER_
Mail Address _430 S. HENRY_
City _PIERRE S.D._ Tel. No. _____

**Architect Engineer**
Name _____
Address _____
City _____
State license no. _____ Tel No. _____

**Contractor**
Name _____
Address _____
City _____
State license no. _____ Tel. No. _____

**Legal description**
Subdivision _FIFTH RAILWAY_
Lot No. _25-26-27-28_ block _5 6_

1. District _CENTRAL BUSINESS_
2. Type of Construction I, II, III, IV, V ✓
3. Group Occupancy A B C D E F G H I J
 Division 1 2 3 4
4. Use Zone — _COMMERCIAL_
5. Fire Zone — _1_

Estimated Cost | $

Type of Construction
Frame ☑ _SPECIAL_
Frame Stucco ☐ _PERMIT FOR_
Brick ☐ _ICE MANUFACTURE_
Brick Veneer ☐
Concrete Block ☐
Number off street parking spaces ☐
Number of stories ☐
Full basement ☐ No basement ☐

| CLASS OF WORK | |
|---|---|
| New | Demolish |
| Alteration | Repair |
| Addition | Move |

Use of building _ICE MANUFACTURING_
Size of building | height

| No. of rooms | No. of families |
|---|---|
| No. of floors | Size of lot |
| No. of bldgs. now on lot | Use of bldgs. now on lot |

SPECIFICATIONS
Foundation

| Material | | Exterior | Piers |
|---|---|---|---|
| Width of Top. | | | |
| Width of Bottom | | | |
| Depth in ground | | | |

| | Size | Spacing | Span |
|---|---|---|---|
| R. W. plate | | | |
| Girders | STATE OF SOUTH DAKOTA | | |
| Joist - 1st floor | CIRCUIT COURT, HUGHES CO. | | |
| Joist - 2nd floor | FILED | | |
| Joist - Ceiling | | | |
| Exterior studs | MAR - 4 2004 | | |
| Interior studs | Christad J. Copeland CLERK | | |
| Roof rafters | By_____ Deputy | | |
| Bearing Walls | | | |

Covering

| Exterior Walls | Roof |
|---|---|
| Interior-Walls | Reroofing |

Flues

| Fire place | Fl. Furnace |
|---|---|
| Kitchen | Water heater |
| Furnace Gas | Oil Electric |

*I hereby acknowledge that I have read this application and state that the above is correct and agree to comply with all city ordinances and state laws regulating building construction.*
Signature of permittee _____
By _____