## Commonwealth *v.* American Ice Co., Appellant.

Argued November 30, 1961. Before BELL, C. J., MUS-
MANNO, JONES, COHEN and EAGEN, JJ.

*Charles W. Hull,* with him *William H. Wood,* and
*Hull, Leiby and Metzger,* for appellant.

*N. David Rahal,* Deputy Attorney General, with
him *David Stahl,* Attorney General, for Commonwealth,
appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 3, 1962:

The basic and only question to be decided in this appeal may be stated as follows: Is the production of ice by artificial methods for commercial purposes to be regarded as "manufacturing"? What is the difference, so far as the process of freezing is concerned, between placing a glass of water on an outer window sill (in January with the temperature under 32 degrees) and pouring water into vats where it is treated by chemicals and machinery so that it is transformed into shiny frozen blocks?

The parties involved in this appeal seek an answer to this question not out of intellectual curiosity but because the answer is transformed into money. The Commonwealth of Pennsylvania, anxious and eager as it has to be to raise funds, in order to run the government, has nevertheless, because of certain policies which it is unnecessary to discuss here, decided to exempt from payment of franchise taxes corporations which are engaged in manufacturing enterprises.

It is thus to the benefit of any corporation to have its business considered as manufacturing because it pays less taxes than those businesses which produce their commodities through the process of non-manufacture. The appellant in this case, the American Ice Company, once enjoyed exemption from state taxation because its ice-making activity was regarded as manufacture under the capital stock tax law but now it has been billed by the Commonwealth for corporate franchise taxes on that same ice-making activity, though both the capital stock tax and franchise tax laws provide for manufacturing exemptions. This inconsistency, if inconsistency it is, brought into existence the present litigation, which arose as follows.

The American Ice Company is a New Jersey corporation qualified to do business in Pennsylvania as a foreign corporation since 1912. The Pennsylvania Cer-

tificate of Authority issued to it in 1933 under the 1933 Pennsylvania Business Corporation Law authorized it to engage, inter alia, in the business of "manufacturing" ice. The Pennsylvania Capital Stock Tax Act of June 1, 1889, P. L. 420, §21 et seq., as amended (72 PS §1871 et seq.), provided for a manufacturing tax exemption applicable to both foreign and domestic corporations. The taxing officers classified the ice-making of this corporation as a manufacturing operation and thus levied no tax on its capital stock.

In 1935, however, the Capital Stock Tax Act was amended by the Act of May 16, 1935, P. L. 184, §1 (72 PS §1871), by imposing a corporate franchise tax upon foreign corporations doing business within the Commonwealth of Pennsylvania. From 1935, therefore, the American Ice Company became subject to this franchise tax (the capital stock tax remained as to domestic corporations). Since, however, this franchise tax amendment made no provision for a "manufacturing" exemption, no problem arose in this connection until 1956 when the Legislature enacted the amendment of March 15, 1956, P. L. (1955) 1285, §1 (72 PS §1871), by providing certain formulas which enabled "manufacturing corporations" to enjoy substantial tax reductions.

In preparing its 1958 Franchise Tax Report, the appellant corporation assumed that its ice business, no different from what it had been prior to 1935, was again entitled to the "manufacturing" exemption for franchise tax purposes, as it had previously enjoyed the manufacturing tax exemption for capital tax purposes.

However, the taxing officers, in settling the corporation's franchise tax account, withdrew the "manufacturing" exemption which it had allowed under the capital stock tax legislation. This withdrawal operated to increase the corporation's franchise tax liability for the year 1958 from $1,081.62 to $3,264.50.

The corporation petitioned for resettlement under The Fiscal Code, 72 PS §1102, protesting the disallowance of the exemption. The petition being refused, it petitioned for review under §1103 of the Code and the review was refused. It then appealed to the Court of Common Pleas of Dauphin County which sustained the settlement of the appellant's franchise tax liability for the year 1958. An appeal to this Court followed.

The technical question involved is whether a foreign corporation engaged in making artificial ice is entitled to the "manufacturing" exemption under the franchise tax legislation (§21 of the Act of 1889, P. L. 420, as amended, 72 PS §1871). The actual stake presently involved is $2,182.88, but the decision will, of course, reflect many more thousands of dollars which may or may not have to be paid in the future, dependent on the rule herein announced.

All this brings us back to the question announced at the outset: Is the production of ice by artificial methods for commercial purposes to be regarded as "manufacturing"? This question would appear to have been definitively resolved by our Court in *Armour and Company v. Pittsburgh*, 363 Pa. 109. In that case the same contentions as to large and extensive plants, intricate machinery and delicate operations were made as are made in the instant case and all of them were rejected by this Court. In that case the Court held that the changing of water into ice with the aid of the alleged intricate machinery and large and extensive plants did not of itself make ice a manufactured article and that therefore it was subject to the mercantile license tax levied by the City and the School District of Pittsburgh. Justice, later Chief Justice, STERN, speaking for a unanimous Court, said, ". . . It was said in Commonwealth v. Weiland Packing Co., 292 Pa. 447, 450, 451, 141 A. 148, 149, that 'the process of manufac-

ture brings about the production of some new article by the application of skill and labor to the original substance or material out of which such new product emerges. If however there is merely a superficial change in the original materials or substances and no substantial and well signalized transformation in form, qualities and adaptability in use, quite different from the originals, it cannot properly and with reason be held that a new article or object has emerged,—a new production been created.' Nor is it of legal significance in this connection that the operations thus conducted require large and extensive plants and organizations, trained men and intricate machinery, for even though the labor be skilled, the operations delicate, a large plant involved, and expensive machinery utilized, such factors, neither individually nor collectively, convert what is essentially a mere processing operation into a manufacturing one: cf. Rieck-McJunkin Dairy Co. v. Pittsburgh School District, 362 Pa. 13, 23, 66 A. 2d 295, 299." [p. 116]

". . . As to *ice,* the process employed is to freeze water in a tank that has brine in it, the brine being chilled by ammonia contained in the coils that run through the tank. The distilling of water has been held not to be manufacturing (Commonwealth v. Sunbeam Water Co., 284 Pa. 180, 130 A. 405) and, by the same token, the mere freezing of water and converting it into ice cannot be said to be manufacturing." [p. 118]

The appellant challenges the correctness of this statement by asserting that the record in the *Armour* case did not adequately describe the complicated and extensive procedure involved in the making of ice. The record proves otherwise.

In the case at bar a stipulation was entered into between the parties on the facts, which stipulation contains a long detailed account of the equipment needed

and the procedure followed in making ice. The language in this description is technological and tautological and, throughout the long passages, one sees the labored effort to make a rather simple function seem complicated. One paragraph taken from the stipulation gives an idea of its circumlocutory and swollen prolixity: "After the core has been reduced to about five (5) gallons in volume and the air tubes have been removed, the water comprising the core, which contains the suspended solids and the entrapped air, must then be sucked from the partially frozen cake in the Ice Can. This is accomplished by the use of a vacuum hose. A suction pump is provided having a suitable hose which is manually immersed in the core for the complete evacuation of the liquids and solids constituting the core. The vacuum hose is then withdrawn from the core space. After this core sucking has been completed, the empty space then remaining in the center of the partially frozen ice cake is filled with clear filtered water by the use of a hose. The water which is thus used to refill the core cannot be agitated because the cake freezes from all four sides of the can toward the center and the air tubes cannot be allowed to remain or they would be frozen into the solid cake of ice."

It is common knowledge that even the most elementary and simple activity can be described in such a manner as to fill a book. Novelists are familiar with this device and accordingly devote numerous chapters to describing so unspectacular an event as a trip of a snail or a human being from the house to the mail box. But, after the wordy portrayal of ice-manufacturing supplied by the appellant in its brief, it is to be noted that, with the repetitious and superfluous details omitted, the process was adequately described by Chief Justice STERN in a few words, in the *Armour* case, supra, as already indicated.

In *Commonwealth v. Sunbeam Water Co.*, 284 Pa. 180, the corporation claimed that it was entitled to exemption from the payment of capital stock taxes under the terms of the Act of July 22, 1913, P. L. 903, because it was engaged in the business of distilling water and that such an operation constituted manufacturing. In that case, as here, the company endeavored to demonstrate the complexities and enormous mechanics involved in distilling water. In the hands of a skillful and imaginative tautologist the distilling of water can indeed be made to seem as complicated as the preparation of a rocket for outer space, but all it really amounts to is boiling water until it becomes steam and then cooling it back to water. We held that this process was not manufacturing and the corporation was not entitled to tax exemption.

Water can take these forms: liquid, gaseous and solid, and it can go from any one of these three states to either of the other two through the intervention of the appropriate temperature but in no instance does the transformation constitute manufacture. In *Commonwealth v. Weiland Packing Co.*, 292 Pa. 447, this Court said: "If however there is merely a superficial change in the original materials or substances and no substantial and well signalized transformation in form, qualities and adaptability in use, quite different from the originals, it cannot properly and with reason be held that a new article or object has emerged,—a new production been created."

Ice is not a new article. It is still what it was originally—water. In fact, if it is allowed to remain in a warm temperature it reverts to water without any human or mechanical interposition. This cannot be said of any product which is generally accepted to be a manufactured product. A table or a chair remains a table or a chair. It may, through use or abuse, be reduced to kindling wood, but it never goes back to being a tree.

This Court analyzed the term "manufacture" as follows in *Commonwealth v. Weiland Packing Company,* supra: "The elemental meaning of the term 'to manufacture' is 'to make' (etymologically, to make by hand), —to make and produce something as a new construction out of existing materials. That is the basic sense of the definition quoted above, and its meaning is illustrated with clearness and emphasis in Norris Brothers. v. Commonwealth, 27 Pa. 494, 496: 'To make, in the mechanical sense, does not signify to create out of nothing; for that surpasses all human power. It does not often mean the production of a new article out of materials entirely raw. It generally consists in giving new shapes, new qualities, or new combinations to matter which has already gone through some other artificial process.'"

The appellant argues that since, through the process which it applies to water, water acquires a new shape, the resulting product must, therefore, be a manufactured article, but the new shape which we find in a manufactured article must be a permanently new shape. As already stated, water may at any moment revert to its original form. If the making of ice per se constituted manufacture then it could be said that the Arctic Zone is a vast ice factory.

It must be conceded, in discussing the question before us, that the line of demarcation between manufactured products and non-manufactured products is not precisely and immutably fixed. No statute defines manufacturing; the decisions are not always uniform. It may well be that, as each commodity comes before the courts for placement in its proper category, some element of arbitrariness, in the interests of established order, enters into the final decision. Be that as it may, the greater reason and line of authorities support the classification of ice as non-manufacturing. No matter how the argument is presented, the fact remains

that all the appellant does is to reduce the temperature of water and thus only temporarily and superficially changes it into something else.

In *Commonwealth v. Lowry-Rodgers Co.,* 279 Pa. 361, the taxpaying corporation contended that the roasting of green coffee beans constituted manufacturing because the bean changed its color and chemical composition and adopted a new size and form. This Court held that the mere changing in form and condition and even chemical content of the coffee bean did not make the process manufacturing. If this were the test, the Court pointed out ". . . then frying eggs, baking potatoes, stewing tomatoes, etc., etc., would be manufacturing, for the application of heat to them requires skill, and effects a chemical change also; . . . . In each and all of these matters, 'in the popular, and therefore in the statutory, sense of the word,' it is probable that few, if any, people would say that the process of cooking is in fact manufacturing . . . ." The Court concluded: "Having regard thereto and to the purpose of the exemption, we have no hesitancy in saying that it does not cover the case of merely cleaning and effecting a chemical change in a natural product, however skilful and beneficial the process and its result may be, even though there also occurs an incidental change in the size, form and weight of that product."

The appellant also argues that it is entitled to exemption under the franchise tax law because it was classified as a manufacturer and allowed the "manufacturing" exemption under the capital stock tax legislation for the year 1934 and previous years. In its brief the appellant says: "This action was taken by Taxing Officers long experienced in administering the 'manufacturing' exemption and well qualified to distinguish between manufacturing and non-manufacturing activities."

But the fact that the taxing officers may have made administrative determinations that ice-making activities constituted manufacturing under the capital stock tax and selective sales and use tax laws is not controlling on the issue before us. ". . . An administrative body cannot, by mere usage, invest itself with authority or powers not fairly or properly within the legislative grant; *it is the law which is to govern rather than departmental opinions in regard to it . . .*" (Emphasis supplied) *Federal Deposit Insurance Corp. v. Board of Finance & Revenue of Commonwealth,* 368 Pa. 463, 472. If artificial ice-making is not, in accordance with governing legal principles, "manufacturing," the opinions of the taxing officers cannot make it so. Such opinions may serve as aids where contemporary interpretation is needed in order to fix the meaning of doubtful statutory provisions, but if they do not accord with governing legal principles they may not supplant the responsibility of the courts to interpret statutes and declare their applicability to existing facts and situations.

Since we conclude that artificial ice-making does not, under governing legal principles, constitute "manufacturing," the appellant company is, therefore, not entitled to the "manufacturing" exemption under the franchise tax law, and the settlement of its franchise tax liability for the year 1958 as made by the Commonwealth was accordingly proper.

Judgment affirmed.

Justice ALPERN took no part in the consideration or decision of this case.

-------------

DISSENTING OPINION BY MR. JUSTICE COHEN:

In holding that the making of artificial ice does not fall within the "manufacturing" exemption of the Pennsylvania Franchise Tax, Act of 1889, June 1, P. L.

420, as amended by Act of March 15, 1956, P. L. (1955), 1285, 72 P.S. §1871, the majority does violence to the reasonable interpretation of the word "manufacturing."

The description of the operations contained in the stipulation of facts clearly reveal a complicated technical production in which a raw material is transformed into a distinct and definite finished product.

Artificial ice is the result of conducting a prescribed series of steps, performed in a fixed sequence, on a body of water, in special apparatus designed and connected for ice-making purposes only.

The artificial ice is frozen in an ice making tank which is a steel tank approximately forty-five inches (45″) deep extending from wall to wall of the tank-room which is partially filled with brine (salt water) with a salinity sufficient to withstand freezing to below 10 degrees Fahrenheit. Ammonia freezing coils are installed in the ice making tank at various spacings, through which ammonia vapor is forced by the ammonia compressors for the purpose of extracting the heat from the brine and cooling it to approximately 15° F.

The ammonia compressors not only serve to force the ammonia vapor through the coils in the ice making tank for cooling the brine but also serve to cool the water in the precooler tank to approximately 35° F. and to refrigerate the storage room to 28° F., all of which is controlled by adjusting the various expansion valves throughout the system. The temperature of the brine in the ice making tank will vary slightly above or below the 15° temperature, depending upon the type of plant and type of water used for making the ice. After the proper temperature has been established for the particular ice making plant involved, it must be watched very closely by the engineer in charge to assure that no change takes place for if the temperature

of the brine is allowed to fall, the ice will be brittle and shatter during handling or if the brine temperature is allowed to rise, the ice will be soft and porous.

The ammonia condenser is used to liquify the ammonia gas as it is discharged from the coils through which it has been forced by the ammonia compressors and the liquified ammonia is then deposited into the liquid receiver so that liquid refrigerant is available at all times for expansion to the brine cooling units and other refrigeration pipes throughout the system. The brine agitator, a pump, is used to keep the brine in constant circulation around the ammonia coils in the ice making tank to insure an even temperature of the brine throughout the ice making tank. This tank is insulated on all sides and bottom to help retain the low temperature of the brine. Also included among the necessary equipment for ice making is a precooler tank. This is an insulated steel tank large enough to hold sufficient clear filtered water to refill the number of ice cans emptied to each pulling of ice. Ammonia coils are installed in this tank to bring the temperature of the water to approximately 35° F. which will shorten the freezing when the ice cans containing this water are placed in the brine tank for freezing. The can filling tank is a steel tank divided into compartments, each of which holds sufficient clear filtered water to make a 300-pound cake of ice. Ice cans supported in steel frames are filled with the clear filtered water which comes by gravity through pipes from the precooler tank to the can filling tank. After the cans have been filled with this clear filtered water they are placed into the 15° brine in the ice making tank for freezing, at which time air tubes are placed in the cans to agitate the water and produce crystal clear ice.

Air under pressure is supplied to these tubes by the air blower, from which a pipe (approximately one inch in diameter) extends over and rests on top of the ice

cans. The air tubes are hung from this pipe and are spaced so as to be located in the center and in the water of each of the ice cans. The air, under pressure, introduced through these air tubes, operates to keep the water in the ice can in motion and to wash the suspended solids and entrapped air from the freezing ice. The suspended solids and entrapped air become concentrated in a core at the unfrozen center of the block. At this step in the operation, the filtered water in the can is freezing from the outer edges inwardly, so that a partially frozen cake of ice, with an unfrozen core containing entrapped air and suspended solids of impurities results. When this core is reduced to about five gallons in volume, the air to the air tubes is shut off and the pipe is disconnected at the header.

The placing and removal of the air tubes in the ice making can is a manual operation and it is one of the most important steps in the making of marketable artificial ice. The air tubes must be watched very carefully at all times because the producing of crystal clear ice is entirely dependent upon the proper manual timing, functioning and withdrawal of these air tubes. If the air tubes are not properly manipulated, the resulting product is snowy or white ice which is non-saleable.

After the core has been reduced to about five gallons in volume and the air tubes have been removed, the water comprising the core, which contains the suspended solids and the entrapped air, must then be sucked from the partially frozen cake in the ice can. This is accomplished by the use of a vacuum hose. A suction pump is provided having a suitable hose which is manually immersed in the core for the complete evacuation of the liquids and solids constituting the core. The vacuum hose is then withdrawn from the core space. After this core sucking has been completed, the empty space then remaining in the center of the

partially frozen ice cake is filled with clear filtered water by the use of a hose. The water which is thus used to refill the core cannot be agitated because the cake freezes from all four sides of the can toward the center and the air tubes cannot be allowed to remain or they would be frozen into the solid cake of ice. It is common knowledge that every cake of commercial ice has a streak of white ice through its core (longitudinal axis). This is due to the fact that the water replaced in the core, as aforesaid, cannot be agitated during the final phase of the freezing process. The entire cake would consist of such white ice if it were not for the agitation hereinbefore described.

After approximately forty-five hours in the ice making tank, the water in the ice cans has frozen solid and the cans are then hoisted from the ice making tank by means of a crane and lowered into the dip tank to loosen the ice from the cans and the ice slides from the cans through the ice door chute into the 28° storage room and held there until sold to the various purchasers.

To view the complicated technical process described above, which is necessary to transform water into commercially useable artificial ice, as anything other than manufacturing flies in the face of reason.

The majority cites *Armour and Company v. Pittsburgh,* 363 Pa. 109, 69 A. 2d 405 (1949), to support its decision. In *Armour* the court stated (at p. 118) that "[T]he mere freezing of water and converting it into ice cannot be said to be manufacturing." Such a description is a vast over-simplification of the intricate procedure involved. In part this is due to the fact that the ice-making process was but sketchily described in the argument of *Armour.* The interpretation of manufacturing given in that case should not be regarded as binding here.

Moreover, there is older authority in this Commonwealth that the artificial production of ice is manufacturing. In *Commonwealth v. Northern Electric L. & P. Co.,* 145 Pa. 105, 117, 22 Atl. 839 (1891), we stated that ". . . The collection, storage, preparation for market, and transportation of ice is not manufacture, but the production of ice by artificial means is."

Although the majority minimizes the significance of administrative determinations exempting the commercial production of ice from application of the Selective Sales and Use Act, the fact remains that where the process has been examined in detail by the taxing authorities to determine its true nature, it has been designated "manufacturing." These interpretations are much more convincing than that given by the majority which pictures the process involved merely as a freezing of water into a solid mass, and concludes, that at any given moment, the ice could be retransformed into its original state—water—and, consequently, it is not manufactured.

Recently, we held that the refining of oil, *Atlantic Refining Company Case,* 398 Pa. 30, 156 A. 2d 855 (1959), and the making of ice cream, *Rieck-McJunkin Dairy Company v. Pittsburgh School District,* 362 Pa. 13, 66 A. 2d 295 (1949), constitute manufacturing. Logic would dictate that the production of artificial ice similarly should be designated manufacturing.

Mr. Justice BENJAMIN R. JONES joins in this dissent.