433 A.2d 465

**COMMONWEALTH of Pennsylvania, Appellant,**

**v.**

**The R. G. JOHNSON COMPANY, Appellee.**

Supreme Court of Pennsylvania.

Argued May 18, 1981.
Decided July 10, 1981.

Roberts, J., dissented and filed opinion in which Nix, J., joined.

Paul S. Roeder, Deputy Atty. Gen., for appellant.

Elliot A. Strokoff, Harrisburg, for appellee.

Before ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

In this case we are asked to determine whether an operator who sinks coal mine shafts and drives coal mine slopes for a soft coal extractor is engaged in the "manufacture" of personal property as that term is defined in the Tax Reform Code of 1971, 72 P.S. § 7201 et seq. The Commonwealth Court, in an appeal from an order of the Board of Finance and Revenue denying a refund to the taxpayer, issued a final order granting a refund to the taxpayer. We affirm.

The parties have submitted a stipulation of facts consisting of forty-six paragraphs and three exhibits.

Taxpayer, the R. G. Johnson Company (hereinafter Johnson), is in the business of sinking bituminous coal mine shafts and driving bituminous coal mine slopes. From September 23, 1974 to September 14, 1977, Johnson paid sales and use taxes totalling ninety-two thousand twenty-eight dollars and sixteen cents ($92,028.16) on the purchase and use of equipment and supplies consumed directly in the sinking of twelve (12) bituminous mine shafts and in the driving of one (1) bituminous mine slope.

Johnson seeks the exclusion allowed for sales and use of equipment and materials used in its operation claiming it is engaged in the manufacture of personal property which is defined in the applicable tax code section as follows:

(c) "Manufacture." The performance of manufacturing, fabricating, compounding, processing or other operations, engaged in as a business, which place any personal property in a form, composition or character different from that in which it is acquired whether for sale or use by the manufacturer, and shall include, but not [be] limited to—

. . . .

(3) Refining, blasting, exploring, mining and quarrying for, or otherwise extracting from the earth or from waste or stock piles or from pits or banks any natural resources, minerals and mineral aggregates including blast furnace slag; . . . .

Tax Reform Code of 1971, as amended 1978, June 9, P.L. 463, No. 62, § 1, 72 P.S. 7201(c) and (c)(3) (Supp.1981–82).

In Western Pennsylvania where Johnson's shaft sinking and slope driving operations are performed, bituminous and soft coal usually runs in horizontal layers, often lying several hundred feet below the surface of the earth. Between the surface and the first coal seam, and in between soft coal seams, there are various kinds of hard rock.

The soft coal layers measure from approximately four to seven feet high and, in productive mines, will cover an area of perhaps 35 square miles, running under rivers and across county lines. In a soft coal mine that runs for several miles,

one reaches a point, typically every four or five miles, where it is virtually impossible to draw adequate ventilation into the area where the current extraction of coal is occurring. Adequate ventilation is necessary to avoid danger of explosion and for the safety of the miners. It therefore is necessary to sink a shaft from the surface several hundred feet down to the mine seam.

Soft coal extractors employ men and own equipment that specialize in the removal of *soft* rocks. Typically, they do not employ men or possess equipment capable of removing or extracting the hard rock lying between the surface and the bituminous coal seams. Therefore, these soft coal extractors call upon hard rock specialists, Johnson being one, to sink the bituminous coal mine air shaft for them according to their specifications. The soft coal extractors arrange for the surface earth at the mine shaft to be removed by others than Johnson, exposing the beginning of the hard rock.

Johnson begins its shaft sinking operations by drilling holes which are then filled with dynamite, detonation caps and other explosive supplies. After detonation, the men and specialized equipment are lowered into the shaft to remove the pieces of rock, rendered manageable by the detonation. This drilling, exploding and removal of rock is repeated until the shaft reaches its destination several hundred feet below the surface of the earth. Depending upon the stability of the rock, at approximately every 15 to 30 feet down, the drilling, exploding, removal operations cease so that the walls of the shaft can be shored up with a strong concrete lining, which is designed to prevent cave-ins and water seepage.

The twelve shafts sunk by Johnson were vertical openings from the surface of the land down several hundred feet through hard rock to the bituminous coal seams.

A slope is an incline opening, running between coal seams or from the surface of the earth down to the first coal seam. The slope driven by Johnson was from one subterranean soft coal seam, lying approximately 640 feet below the surface on a 15° incline up to another coal seam lying approximately

475 feet below the surface. The length of the slope is approximately 658 feet. The slope was driven in a similar drilling, blasting and extraction pattern. Johnson maintains and the Commonwealth Court unanimously agreed, that these operations are entitled to the so-called "mining exclusion".

The Commonwealth has maintained that these operations are not entitled to exclusion from sales and use tax and places great emphasis on the stipulated fact that Johnson's only work was " rock tunneling" to make air shafts and a slope and that Johnson did not extract coal.

That Johnson does not actually extract the coal, is not determinative. As stipulated by the parties, the equipment used in the actual extraction of bituminous coal does not alternatively serve in the removal of the hard rock which lies above and between soft coal seams. The soft coal operator is dependent upon the equipment capabilities of the hard rock extractor; the extraction operation is *inextricably intertwined* with ventilation of the coal seams and the attendant differences in extracting "hard" and "soft" coal requires specialization. There has evolved, therefore, a delineation in the bituminous industry, by which the business of removing the "hard" rock between the "soft" coal seams has fallen to a specialized operator. Anthracite or "hard" coal operators have the equipment capability to extract the rock between coal seams with the same equipment used for the "hard" coal extraction and need not contract out the hard rock work.

If mining equals extraction, as the Commonwealth argues, then in order to be consistent, the Commonwealth would have to deny the tax exclusion for equipment and materials used by a hard coal extractor in sinking its own shafts and slopes and allow the exclusion only for equipment used directly in extraction. However, the Commonwealth concedes that if the extractor performed the same work as that done by Johnson, then the exclusion from sales and use tax would be available for the equipment so used. We believe that it is not the identity of the party who performs the work but the nature of the work done that should control

the allowance or denial of the exclusion. This conclusion is consistent with the regulations published by the Department of Revenue at Title 61, Revenue, section 32.35 Mining, where the following criteria are set forth for determining whether the sale at retail and use of certain equipment or "property" is subject to sales and use tax:

(1) *Direct use.* In determining whether property is directly used [in mining], consideration shall be given to the following factors:

(i) The physical proximity of the property in question to the production process in which it is used;

(ii) The proximity of the time of use of the property in question to production processes which precede and follow its use;

(iii) The active causal relationship between the use of the property in question and the production of the mined product. The fact that particular property may be considered essential to the conduct of the business of mining because its use is required either by law or practical necessity does not, of itself, mean that the property is sued directly in mining operations.

Johnson is engaged in an activity that is both physically close to the production and close in time to the production process. There exists a distinct "active causal relationship" between the use of the property employed by Johnson and the production of the mined product. This factor is most persuasive. Without access to the underground seams of coal by the driving of slopes, there is no coal production. Without the ventilation of coal seams by the sinking of shafts, there is no safe workplace for the extraction of coal.

Accordingly, we hold that the sale at retail and use of equipment used by hard rock extractor in making possible the access to and extraction of bituminous coal is involved in manufacturing for the purpose of the exclusion granted by the legislature from sales and use tax and we affirm the order of the Commonwealth Court, 50 Pa.Cmwlth. 111, 411 A.2d 1315.

Affirmed.

ROBERTS, J., filed a dissenting opinion in which NIX, J., joins.

O'BRIEN, C. J., and WILKINSON, J., did not participate in the consideration or decision of this case.

ROBERTS, Justice, dissenting.

I dissent. Taxpayer's sole contribution to the process of coal mining is the sinking of mine shafts and slopes for unrelated companies who extract coal for sale. The parties have stipulated that taxpayer "is not in the business of directly extracting coal or any other minerals or natural resources from the earth for the sale, by it, of coal, or any other minerals or natural resources." Thus I fail to see any basis for concluding that taxpayer can avail itself of the "mining" exclusion contained in the Tax Reform Code of 1971, 72 P.S. § 7201(c)(3). Compare *Commonwealth v. American Ice Co.*, 406 Pa. 322, 178 A.2d 768 (1962) (ice maker not manufacturer) with *Rieck-McJunkin Dairy Co. v. Pittsburgh School District*, 362 Pa. 13, 66 A.2d 295 (1948) (ice cream maker, who uses ice in process, manufactures). The order of the Commonwealth Court, therefore, should be reversed, and the order of the Board of Finance and Revenue reinstated.

NIX, J., joins this dissenting opinion.