IN THE COMMONWEALTH COURT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| Darryl Lawrence, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1346 C.D. 2024 |
| | : | |
| Pennsylvania Public Utility Commission, | : | Argued: December 8, 2025 |
| | : | |
| Respondent | : | |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE STACY WALLACE, Judge
HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

***OPINION NOT REPORTED***

MEMORANDUM OPINION[1]
BY JUDGE McCULLOUGH             FILED: March 24, 2026

      Darryl Lawrence, Acting Consumer Advocate, Office of Consumer Advocate (OCA) petitions for review of the September 12, 2024 order entered by the Pennsylvania Public Utility Commission (Commission) that approved a non-unanimous settlement relating to a general rate increase filed by Peoples Natural Gas LLC.[2] On appeal, the OCA challenges the Commission's denial of its request that the

---

[1] This opinion is filed pursuant to Section 256(b) of the Internal Operating Procedures of the Commonwealth Court, 210 Pa. Code § 69.256(b).

[2] Peoples Natural Gas LLC includes Peoples Natural Gas Division and Peoples Gas Division (referred to collectively herein as Peoples).

Commission order Peoples to conduct a root cause analysis[3] concerning its service termination procedures for non-payment of account arrears, which the OCA contends has a disparate impact on Black households in Peoples' service territory in violation of Section 1501 of the Public Utility Code (Code), 66 Pa.C.S. § 1501, which requires public utilities to maintain adequate and reasonable service.[4] Peoples, however, maintains that the OCA, by failing to raise this disparate impact issue before the Commission, has waived its ability to argue it on appeal. After careful review, we are constrained to agree with Peoples that the disparate impact issue has been waived because it **was never presented** to the Commission, and must affirm on this basis.

## Background

The relevant facts and procedural history of this case are as follows. Peoples is a natural gas distribution company and a public utility subject to the regulatory jurisdiction of the Commission. On December 29, 2023, Peoples filed original Tarriff Gas Pa. P.U.C. No. 48 proposing changes in rates, rules, and regulations, which it projected would produce $156 million dollars in additional annual revenue. On January 5, 2024, the OCA filed a formal complaint opposing Peoples' proposed tariff changes, and the Bureau of Investigation and Enforcement (I&E) entered an appearance. The Office of the Small Business Advocate (OSBA) filed a formal complaint on January 11, 2024. On January 18, 2024, the Commission suspended the proposed tariff until September 27, 2024, for assessment of its legality,

---

[3] "A root cause analysis is a fact-based exercise in which the underlying cause or causes of an undesirable outcome are identified and specific remedial steps are identified and determined to result in correcting or improving the previously identified undesirable result." (Reproduced Record (R.R.) at 212, Direct Testimony of Barbara R. Alexander.)

[4] Section 1501 of the Code requires public utilities in relevant part to "furnish and maintain adequate, efficient, safe, and reasonable service and facilities[.]" 66 Pa. C.S. § 1501.

reasonableness and justness.[5] Peoples Industrial Intervenors (PII)[6] filed a formal complaint on February 1, 2024.

At a prehearing conference, the Administrative Law Judge (ALJ) assigned to the case granted intervenor status to Pennsylvania Independent Oil & Gas Association (PIOGA), Pennsylvania Weatherization Providers Task Force (PWPTF), and the Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania (CAUSE-PA). The ALJ conducted three days of public input hearings on the matter in March of 2024. On May 9, 2024, the ALJ held an evidentiary hearing at which several witnesses testified, and the ALJ entered the parties' written testimony and exhibits into the record. Counsel advised the ALJ that all of the parties except for the OCA had reached an agreement on all issues.

The OCA submitted the testimony of Rodger D. Colton, who explained that he owns a public finance and general economics firm that advises various entities on rate and customer service issues involving water/sewer, natural gas, and electric utilities, with a focus on low-income utility issues. (R.R. at 184a.) During his examination, the following exchange took place concerning Peoples' service termination procedures for non-payment of arrears:

> Q. In your analysis of [Peoples'] disconnection data, does there appear to be any relationship between the increased disconnection of service for non-payment and zip codes with the highest percentage of black households?

---

[5] Section 1301(a) of the Code mandates that any rate increases be just and reasonable and provides in pertinent part: "every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the [C]ommission." 66 Pa. C.S. § 1301(a).

[6] PII is an *ad hoc* group of energy-intensive customers receiving natural gas transportation services from Peoples, including Duquesne University, Indiana Regional Medical Center, and WHEMCO, Inc. (App. A116, n.3.)

3

A. Yes. I begin by noting that based on the information I have reviewed, I have seen no indication of intentional discrimination on the part of [Peoples]; however the data does appear to show a correlation or relationship between the increased disconnection of service for non-payment and zip codes with the highest percentage of black householders. In reaching this conclusion, I began by identifying the 40 zip codes with the highest percentage of Black householders in [Peoples'] service territory. I calculated the percentage of total Peoples customers living in those zip codes. I then examined the number of nonpayment disconnections that occurred in those zip codes and calculated the percentage of total Peoples disconnections occurring in those zip codes. [] The data shows that 29% of [Peoples'] total customer base resides in the 40 zip codes with the greatest percentage of Black householders. In contrast, between 38% and 47% of the total number of [Peoples'] nonpayment service disconnections occur in those 40 zip codes.

[The data] further shows that this disproportionate number of disconnections does not occur in these zip codes with a high penetration of Black householders because of a higher penetration of low-income households in those zip codes. Indeed, the percentage of total Black householders with income at or below 150% [of the] F[ederal ] P[overty] L[evel] is lower than the percentage of total Black householders overall in the 40 study zip codes. While 29% of the total Black householders live in these 40 zip codes, only 23% of the total population with income at or below 150% of Poverty does so.
. . . .

Q: Please explain why this data and information is relevant in this case?

A: This information is relevant to quality-of-service concerns and the provision of service on fair and equitable terms within Peoples' service territory. Peoples is likely not even

4

aware of this correlation, and I think it is important to shed light onto it to ensure that it can be remedied in the near term.

Q. What do you recommend?

A. I recommend that Peoples conduct a root cause analysis to determine what is driving this disproportionate level of utility disconnections within the 40 zip codes with the highest penetration of Black households. Once this root cause analysis is conducted, Peoples should commit to taking steps to address the cause with the commitment of reducing disproportionate disconnections within these zip codes.

(R.R. at 203a-05a.) Mr. Colton opined that "[b]ased on the information that is currently available, the relationship cannot be explained by reference to factors other than race." (R.R. at 343a.)

In response, Peoples presented the testimony of Heather Doyle-Conley, the Vice President of Customer Operations for Essential Utilities, Inc., who leads customer operations for Peoples. Ms. Doyle-Conley disagreed with Mr. Colton's position that a root cause analysis was necessary because:

> **collections activities, including termination, are strictly arrears based**. Mr. Colton noted he did not see any intention that [Peoples] initiates termination of service in a discriminatory manner and Mr. Colton is indeed correct. [Peoples] does not disconnect service based on demographics and does not discriminate.
> . . . .
>
> **The collections process is automated. It first identifies accounts with arrears that have reached a threshold for potential disconnection of service. Any account that exceeds the threshold would first receive a notice of disconnection that provides not only the amount of arrears, but also offers information to the customer about contacting [Peoples] to discuss payment arrangements, provide a medical certificate and to contact the []**

5

**Commission. The notice also includes information on available cash assistance, such as [Peoples'] hardship fund and the Low Income Home Energy Program ("LIHEP").** If customers do not respond to the notice, the account moves into the next step which is personal contact. Personal contact attempts can be made via telephone or field visit, depending on the availability of a working phone number for the household. If the account arrears have not yet been addressed, the account will finally move to the creation of a service order for field service teams to disconnect the gas service. **This is a color-blind process that does not consider any demographical information about the customer or the area in which the customer resides.**

(R.R. at 299a, 377a) (emphasis added).

On May 10, 2024, the ALJ issued a briefing order requiring the parties to file a joint petition for settlement[7] along with statements in support and briefs. On May 30, 2024, Peoples, I&E, OSBA, PII, and PIOGA filed a Joint Petition for Non-Unanimous Settlement (Non-Unanimous Settlement) along with statements in support. CAUSE-PA and PWPTF indicated that they did not oppose the Non-Unanimous Settlement, while the OCA filed Comments in Opposition to the Non-Unanimous Settlement and a supporting brief in June of 2024.

On July 15, 2024, the ALJ issued a Recommended Decision advising the Commission to grant the Joint Petition to approve the Non-Unanimous Settlement without modification. In doing so, the ALJ recommended that the Commission deny the OCA's request that it order Peoples to conduct a root cause analysis concerning its service termination procedures for non-payment in the areas of its service territory with the highest proportion of Black households. In rejecting the OCA's claim that a root cause study must be ordered, the ALJ recognized that "[a]ddressing the root cause of

---

[7] We note that "[i]t is the policy of the Commission to encourage settlements." 52 Pa. Code § 5.23(a).

6

poverty in certain communities and demographics is important," but that a root cause analysis was not warranted based on the circumstances of this case where Peoples' automated termination procedure is strictly arrearage-based, does not disconnect customers on the basis of demographics, and there is no evidence in the record of explicit discrimination. (App. A 191.)

The OCA filed 18 exceptions to the Recommended Decision, including Exception No. 17, which challenged the ALJ's determination regarding the necessity for a root cause analysis.[8] The Commission issued an order on September 12, 2024, in which it adopted the ALJ's Recommended Decision, denied all of the OCA's exceptions, and approved without modification the Joint Petition for Non-Unanimous Settlement. In rejecting the OCA's Exception No. 17, the Commission determined:

> The record reflects that [Peoples] provided substantial evidence that its termination procedures are automated based on the amount of the arrearage and do not account for demographics. Without any evidence that [Peoples'] procedures are discriminatory – explicitly or implicitly – the OCA has failed to persuade us that a root cause analysis is justified. Simply put, we echo I&E in stating it is not our role to impose such an analysis upon a single utility, absent proof.

(App. A106.)

This petition for review followed. Peoples, PIOGA, PII, and CAUSE-PA have intervened in this appeal.[9]

---

[8] Exception No. 17 stated: "The ALJ erred in determining that the OCA must prove that Peoples engaged in explicit discrimination as a condition of requiring Peoples to conduct a root cause analysis regarding termination of black households." (R.R. at 1272a.)

[9] Peoples submitted a brief supporting the Commission's order. The PIOGA joined Peoples in requesting that this Court affirm the Commission's decision and noted that, although the negotiated Non-Unanimous Settlement of the parties involved multiple issues and matters, the issue before us

**(Footnote continued on next page…)**

7

**Discussion**

The OCA raises overlapping arguments on appeal, all of which challenge the Commission's denial of its request to order Peoples to conduct a root cause analysis concerning its service termination procedures for non-payment of arrears in Black neighborhoods within its service territory. The OCA contends that Peoples' termination procedures violate Section 1501 of the Code, which requires that all utility services, including termination procedures, be adequate and reasonable, even if no explicit or implicit discriminatory intent is established. (OCA's Brief, at 15-21, 32-33.) The OCA additionally maintains that under Pennsylvania law, once a plaintiff establishes that a particular procedure results in a disparate impact, there is no need to show an intent to discriminate, either explicitly or implicitly, so long as there is no legitimate explanation as to why the policy results in the disparate impact. *Id.* at 22-24, 28-31. According to the OCA, the Commission applied an incorrect legal standard by failing to apply a disparate impact analysis to its request for a root cause analysis, as is required under article I, Section 29 of the Pennsylvania Constitution.[10] *Id.* at 14, 20. To support its claim, the OCA relies on Mr. Colton's testimony indicating that he identified 40 zip codes within Peoples' service territory containing the highest percentage of Black households within which customer accounts are terminated for nonpayment of arrears at a greater rate than in other service locations despite any evidence that these areas are low income. *Id.* at 25-27.

---

on appeal is very narrow. (PIOGA Br., at 5.) Intervenors PII and CAUSE-PA did not file appellate briefs and were precluded from participating in oral argument.

[10] "Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the race or ethnicity of the individual." Pa. Const. art. I, § 29.

Peoples, however, maintains that the OCA, by failing to raise this disparate impact issue below, has waived its right to argue on appeal that the Commission should have applied this standard, as OCA never articulated this new legal theory to the Commission. (Peoples' Br., at 12.); *see also* Pa.R.A.P. 302(a) (issues not raised in prior proceedings are waived on appeal).[11]

As a general matter, "issue preservation is foundational to proper appellate review." *Trigg*, 229 A.3d at 269. Requiring issues to be properly raised first before the Commission ensures that it has the opportunity to consider a potential appellate issue and correct any error at the first available opportunity, promotes the orderly and efficient use of judicial resources, and ensures fundamental fairness to the parties. *See id.* Our Supreme Court has emphasized that "[w]aiver is indispensable to the orderly functioning of our judicial process and developed out of a sense of fairness to an opposing party and as a means of promoting jurisprudential efficiency by avoiding appellate court determinations of issues which the appealing party has failed to preserve." *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1125 (Pa. 2000). The Supreme Court has also held that "mere issue spotting **without sufficient analysis or legal support precludes appellate review**." *Commonwealth v. Armolt*, 294 A.3d 364, 379 (Pa. 2023) (determining issue was waived due to "appellant's failure to adequately develop it with argument, **applicable authority**, and **pertinent analysis**.") (emphasis added).

Here, we are constrained to conclude that the OCA waived its disparate impact argument, as it never raised this issue before the Commission, but included the issue in its legal brief. In its 152-page brief filed with the Commission, the OCA

---

[11] "The issue of waiver presents a question of law, and, as such, our standard of review is *de novo* and our scope of review is plenary." *Trigg v. Children's Hospital of Pittsburgh of UPMC*, 229 A.3d 260, 269 (Pa. 2020).

9

dedicated only two pages to its request for a root cause analysis, in which it cited **no caselaw or legal authority whatsoever** to explain the legal basis for its claim. (*See* R.R. at 710a-711a.) Instead, the OCA referred the Commission only to Mr. Colton's testimony concerning disproportionate disconnection data, rather than to any legal authority pursuant to which the Commission could appropriately grant the requested relief. Similarly, the OCA's Exception No. 17 did not include any reference to the disparate impact standard, and simply asserted: "The ALJ erred in determining that the OCA must prove that Peoples engaged in explicit discrimination as a condition of requiring Peoples to conduct a root cause analysis regarding termination of black households." (R.R. at 1272a.)

Additionally, and critically, in its appellate brief and at oral argument before this Court, the "OCA recognize[d] that the application of the disparate impact standard to terminations for nonpayment of public utility service is one of **first impression**." (OCA's Br., at 17) (emphasis added). The OCA likewise averred that "[d]isparate impact analyses have not been applied in the context of adequate and reasonable public utility service, specifically, but **other areas of law provide a two-part test**[.]" (OCA's Br., at 13) (emphasis added.) The OCA explained this test to this Court as follows:

> Disparate impact analyses in **other areas of law**, or pursuant to **other statutory mandates**, are instructive and provide a two-part test: a claimant is required to establish a *prima facie* case that a disparate impact occurs, creating a presumption of discrimination, which the defendant then must rebut by demonstrating that the disparate impact resulted from legitimate, non-discriminatory practices.

> To inform this Court's determination as to how a disparate impact analysis should be conducted under Section 1501 of the Public Utility Code, the OCA provides the below

10

summary of how disparate impact analyses have been conducted by the courts of this Commonwealth.

(OCA's Br., at 22) (emphasis added.)

However, during rebuttal argument in this Court, when the OCA was questioned as to whether it preserved this disparate impact argument, the OCA conceded that it did not "use that particular phrase" before the ALJ or the Commission.[12] Therefore, despite the admitted novelty of its disparate impact argument, the OCA failed to expressly raise it below, leaving the Commission without notice of the specifics of its claim within the context of its broader Section 1501 issue. Furthermore, in its brief and reply brief filed in this Court, Petitioner did not identify where in the record it raised its disparate impact claim or its asserted two-part test, as required by Rules 2117(c) and 2119(e) of the Pennsylvania Rules of Appellate Procedure. *See* Pa.R.A.P. 2117(c), 2119(e). Instead, the OCA directs our attention to its Section 1501 claim and Exception No. 17 requesting a root cause analysis, which do not explain the disparate impact standard. (*See* OCA's Reply Br., at 4, 20-21.) The OCA additionally concedes that because application of the disparate impact standard under Section 1501 of the Code is one of first impression, "the need to include additional legal authority **beyond the arguments made to the Commission** to assist this Court in its resolution of the issue is clear." (*Id.* at 21 n. 7) (emphasis added).

Based on this record, we conclude the OCA has waived the disparate impact issue on appeal. *See* Pa.R.A.P. 302(a); *see also HIKO Energy, LLC v. Pennsylvania Public Utility Commission*, 209 A.3d 246, 261 (Pa. 2019) (stating general rule that "a party waives appellate review of a claim when it fails to raise the issue

---

[12] This Court may consider statements made by counsel during oral argument in rendering our decisions. *See, e.g., McElfresh v. Department of Transportation*, 963 A.2d 582, 587 (Pa. Cmwlth. 2008); *R. G. Johnson Company v. Commonwealth of Pennsylvania*, 411 A.2d 1315, 1316 (Pa. Cmwlth. 1980), *affirmed*, 433 A.2d 465 (Pa. 1981).

before an administrative tribunal rendering a final decision"); *Retail Energy Supply Association v. Pennsylvania Public Utility Commission*, 185 A.3d 1206, 1230 (Pa. Cmwlth. 2018) (*en banc*) (stating that when a party fails to raise an issue, even one of a constitutional dimension, in a PUC proceeding, the issue is waived and cannot be considered for the first time on appeal).

We recognize that the OCA refutes Peoples' claim of waiver by framing its disparate impact argument as merely "additional authority [] provided on appeal" in support of its original Section 1501 issue. (OCA's Reply Br., at 4.) However, we find this assertion unpersuasive, as the OCA simultaneously avers that a disparate impact analysis has **never been applied** in the context of a Section 1501 action and is a matter of first impression. As such, it was incumbent upon the OCA to present its argument to the ALJ and the Commission in the first instance, both for issue preservation purposes and because its failure to do so deprives this Court of the Commission's insight and expertise in addressing this novel issue. *See Popowsky v. Pennsylvania Public Utility. Commission*, 937 A.2d 1040, 1059 (Pa. 2007) (recognizing that the Commission is charged with administering public utility regulation and employs specialized expertise in making determinations concerning the weight and balancing of associated policy considerations). **We reiterate that the OCA did not merely neglect to say the words "disparate impact" to the Commission- it also failed to raise the very specific two-part test it requests this Court to apply for the first time on appeal.**

In reaching this conclusion, we are mindful that the Pennsylvania Supreme Court has "held on numerous occasions that where the parties fail to preserve an issue for appeal, an appellate court may not address the issue, even if the disposition of the trial court was fundamentally wrong." *Gibraltar Rock, Inc. v. Department of*

*Environmental Protection*, 286 A.3d 713, 724 (Pa. 2022) (determining that Commonwealth Court erred by deciding appeal based on independent consideration and analysis of unpreserved constitutional and statutory issues); *see also Knarr v. Erie Insurance Exchange*, 723 A.2d 664, 665 (Pa. 1999) (concluding Superior Court exceeded its scope of review by addressing argument that had been waived, regardless of accuracy of its legal analysis).[13]  Our Supreme Court has also emphasized that in assessing whether waiver applies, a **critical factor** is **whether the record demonstrates "the lower tribunal's comprehension of the claim."**  *HIKO Energy, LLC,* 209 A.3d at 263.  In *HIKO*, the Court rejected the appellant's position that it properly preserved its appellate issue during the proceedings before the Commission, and explained:

> *HIKO* asserts that it raised the excessive fines constitutional theory in its Answer to [the] Complaint, as well is in its Exceptions to the ALJs' Penalty Decision.  In its Answer [to the] Complaint, *HIKO* asserted that the "requested relief is grossly disproportionate to said violation(s)."  In the Exceptions filed to the ALJs' Initial Decision, *HIKO* **generally argues** that the ALJs failed to properly apply the penalty factors and consider mitigating circumstances, which resulted in a disproportionate penalty.  Critically, however, **the PUC did not recognize these references** as HIKO raising a constitutional argument, **because the Commission did not analyze or mention whether the penalty complied with the Excessive Fines Clause**.  Accordingly, because *HIKO* failed to raise its constitutional challenge before the PUC, we hold that the argument is waived.

---

[13] The OCA has also filed an application for relief in this Court requesting that we take judicial notice of a Secretarial Letter and Report issued by the Commission on August 5, 2025, in a case involving a water and wastewater rate increase requested by the Pennsylvania-American Water Company (PAWC). *See* Pa.R.E. 201 (permitting courts to take judicial notice of adjudicative facts). In light of our disposition of waiver, we deny the OCA's application for relief.

*Id.* (record citations omitted) (emphasis added).

Likewise, here, the ALJ and the **Commission** did not recognize the OCA's root cause analysis claim as raising a disparate impact argument and therefore **made no findings as to disparate impact, as the OCA failed to frame its issue as such**. The ALJ and the Commission were therefore **never given the opportunity to assess** whether the disparate impact standard applies in the context of a Section 1501 claim, and, if it does, to articulate the appropriate analytical framework. Given the significance of the disparate impact claim, and its potential implications for the natural gas industry, it is imperative that the Commission be given the opportunity to properly address the issue first, before this Court can review any claim of error.

In reaching this determination, we reiterate that the OCA dedicated only two pages of its voluminous brief filed with the Commission to addressing its root cause analysis request, wherein it cited no supporting legal authority, and referenced only witness testimony. The Dissenting Opinion has followed suit, in that it points to Mr. Colton's testimony to support its position that the OCA has preserved its disparate impact issue for appeal. However, the Dissent neglects to point to any place in the record where the OCA preserved this issue with sufficient legal analysis discussing applicable authority as is mandated by our caselaw. *See Armolt*, 294 A.3d at 379.[14]

---

[14] The Dissent concedes that the OCA failed to "establish[] the existence of a disparate impact", but nonetheless concludes that the OCA is entitled to the study, despite this absence of proof. (Leadbetter, J., dissenting at 1, n.1). The Dissent cites no legal authority to support this position and makes no attempt to explain on what legal grounds the study should be ordered. The OCA's entire argument is based on its asserted meeting of the disparate impact legal standard, which the Dissent recognizes was not met. (*See* OCA's Br., at 15.) However, as outlined above, the OCA never raised this legal standard during the proceeding below, and it is waived. Significantly, we again emphasize the OCA's brief filed with the Commission failed to include any mention of the disparate impact legal standard. (R.R. at 710a-711a.) In fact, in requesting the root cause analysis, **the brief does not discuss any legal authority at all**. *See id.* The merits of the issue therefore cannot be addressed by this Court.

14

## Conclusion

Because the OCA did not raise its disparate impact issue before the ALJ or the Commission, we are constrained to find the issue waived on appeal. We therefore affirm the September 12, 2024, order entered by the Commission.[15]

_____
PATRICIA A. McCULLOUGH, Judge

Judge Fizzano Cannon did not participate in the decision for this case.

---

[15] We observe that the OCA is not without an avenue of redress for its disparate impact claim. At oral argument for this case, after counsel for the Commission indicated that this rate proceeding was not the appropriate method of bringing this claim, the following exchange took place:

> Q. What proceeding would be appropriate for that?
>
> A. [The OCA] could file a formal complaint with the Commission and hopefully obtain additional evidence which would establish if there was or was not discrimination in the practices, and it could be remedied that way.

(Commonwealth Ct. Oral Argument, 12/08/25, at 1:44:15.) The Commission also pointed out this alternate method of redress in its brief by stating: "[i]f OCA wants the Commission to decide whether Peoples' service termination practices violate § 1501, the proper avenue is for OCA to file a formal complaint with the Commission." (Commission's Br., at 29.)

15

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Darryl Lawrence,                               :
                    Petitioner                 :
                                               :
            v.                                 :    No. 1346 C.D. 2024
                                               :
Pennsylvania Public Utility                    :
Commission,                                    :
                    Respondent                 :

## *ORDER*

AND NOW, this 24th day of March, 2026, the order entered by Pennsylvania Public Utility Commission on September 12, 2024, is hereby AFFIRMED. The August 18, 2025 application for relief filed by the Office of Consumer Advocate is hereby DENIED.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Darryl Lawrence,               :
             Petitioner       :
         :
    v.                         :    No. 1346 C.D. 2024
                                :    ARGUED: December 8, 2025
         :
Pennsylvania Public Utility       :
Commission,                    :
            Respondent     :

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE STACY WALLACE, Judge
                  HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## <u>OPINION NOT REPORTED</u>

**DISSENTING OPINION BY**
**SENIOR JUDGE LEADBETTER**            **FILED: March 24, 2026**

      I must respectfully dissent, because I do not agree that OCA waived the issue of whether it had put on sufficient evidence to justify a root cause study to determine whether Peoples' practices had a disparate impact on black households.[1] While OCA raised a plethora of issues in opposition to Peoples' proposal, this was clearly one of them.

      As the majority noted, OCA presented the testimony of Roger Colton, who stated that, "I have seen no indication of intentional discrimination on the part of the Company; however, the data does appear to show a correlation or relationship between the increased disconnection of service for non-payment and zip codes with

---

[1] I do not believe that OCA established the existence of a disparate impact, only that it offered sufficient evidence to justify the need for the recommended study.

the highest percentage of black householders. . . . I recommend that Peoples conduct a root cause analysis to determine what is driving this disproportionate level of utility disconnections within the 40 zip codes with the highest penetration of Black households." Testimony of Roger Colton at N.T. 20, 22, R.R. 203a, 205a. Later in his testimony, he opined:

> Peoples Rule 3 provides that the Company may require a deposit if, among other things, "the Applicant is unable to establish creditworthiness to the satisfaction of the Company through the use of a generally accepted credit scoring methodology which employs standards for using the methodology that fall within the range of general industry practice." (Rule 3.E(2), Gas-PA PUC No. 48, Original Page No. 19).

> This provision, standing alone, carries with it an elevated risk of discrimination, even if unintentionally. . . . To the extent that a Peoples "credit scoring methodology" considers whether a consumer is employed and, if so, for how long, that reliance on the lack of employment (or the lack of long-term employment) may have the effect of discriminating against consumers who lack employment because they receive public assistance (one of the protected classes under ECOA). In addition, any consideration of whether a consumer is a homeowner, as well as about whether a consumer is banked or unbanked, has a high probability of having *racially disparate impacts*. It will come as no surprise, for example, that the National Association of Realtors found that the homeownership gap for Blacks and Hispanics has grown even bigger in recent years. So does the question of whether a consumer has a bank account (credit card, loan or other credit reference) have distinct racial implications.

Testimony of Roger Colton at N.T. pp. 79-80, R.R. 262a-263a (emphasis added).

Moreover, in it's Main Brief to the Commission, OCA argued:

> The OCA recommends that Peoples conduct a root cause analysis to determine why there are a disproportionate

BBL - 2

> number of terminations for nonpayment in the portions of the Company's service territory with the highest proportions of Black householders. OCA St. 6 at 22.
>
> OCA witness Colton identified that, in the 40 zip codes within Peoples' service territory that contain the greatest proportion of Black householders, customers are terminated for nonpayment at a greater rate than in other portions of the Company's service territory. *Id*. at 22.
>
> Peoples should conduct a root cause analysis to determine *why* there is a connection between higher levels of termination and a higher presence of Black householders to ensure that there is no portion of Peoples' termination process which may be compromised by unintended and implicit biases. OCA St. 6 at 22.
>
> The Commission should take this opportunity to direct and the Company to conduct a root cause analysis, as suggested by Mr. Colton, in order to ensure that its termination procedures do not have any incidental discriminatory impacts. *Id*.

Main Brief of OCA at pp. 128-29, R.R. 710a-11a.

> Simply put, I believe this is more than sufficient to preserve the issue.

————————————————

**BONNIE BRIGANCE LEADBETTER,**
President Judge Emerita